[773 NYS2d 371]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ADAM COHEN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STANLEY COHEN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMIE K.C. SCHER, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TODD SPEHLER, Appellant.

First Department, March 11, 2004

72

**APPEARANCES OF COUNSEL**

*Robert M. Morgenthau, District Attorney*, New York County (*Gina Mignola* and *Amyjane Rettew* of counsel), for respondent.

*Mark L. Freyberg* for Adam Cohen and another, appellants.
*Jeremy Gutman* for Stanley Cohen, appellant.
*Roger J. Schwarz* for Todd Spehler, appellant.

### OPINION OF THE COURT

Tom, J.P.

This appeal arises from the perjury convictions of an inter-related group of persons who, while under oath before the National Association of Securities Dealers (NASD), falsely denied that one of the defendants, Stanley Cohen, supervised a retail sales operation of a stock brokerage firm, Renaissance Securities Financial Corporation (Renaissance), despite a 1973 Securities and Exchange Commission (SEC) order barring him for life from associating with any broker-dealer in a proprietary or supervisory capacity.

The distant roots of this case date to the early 1970s, when Stanley Cohen had owned a Wall Street broker-dealer firm. At that time, Stanley Cohen was charged with various securities violations, including aftermarket trading to manipulate stock prices. As a consequence of these violations, in 1973 the SEC barred him from the securities industry for two years and barred him for life from exercising supervisory responsibilities in the industry. In 1994, seeking to return to stock selling, he applied to the NASD for permission to work at a particular securities firm, at which time the NASD responded that he had a lifelong prohibition from supervision and could never act in a supervisory capacity. He was also advised at that time that every time he changed jobs, he had to undergo the NASD application process anew. His application was granted, but several conditions were imposed regarding the nature of his responsibilities and the need for oversight of his trades. Hence, as is relevant to the discussion of issues below, Stanley Cohen's understanding of the limitations under which he could participate in the industry could not have been clearer to him. He remained in that position for only two years, during which time his earnings were modest.

In 1996, Stanley Cohen changed jobs without notifying NASD. He and his son, defendant Adam Cohen, were hired by Renaissance which was owned by defendant Todd Spehler. Stanley Cohen was hired to run Renaissance's retail sales division. Previously, stock trades for Renaissance were executed by the firm's Atlanta branch. William Holmquist and Arthur Kishpaugh were licensed securities traders in the Atlanta office. When they

started at Renaissance the Cohens brought several other traders with them, many from Stanley Cohen's former employer. These brokers were solicited with the inducement that they were joining a new business enterprise that would prove to be very lucrative.

From the beginning Stanley Cohen expected to take the initiative in how Renaissance would be run. According to the testimony of several of these brokers, as well as other employees, the Cohens essentially refashioned the Renaissance operation. Although Holmquist and Kishpaugh had previously managed the firm's inventory, made trading decisions and executed major trades, with the active participation of Spehler, once Stanley Cohen was hired, he assumed control over trades from the New York office. This, of course, was in direct violation of the NASD ban. The Atlanta brokers and certain of the New York brokers brought in by the Cohens made clear that Stanley Cohen made trading decisions, set prices and fees, and developed firm strategy regarding whether markets would be made for particular stocks.

Initially, Stanley Cohen relegated the Atlanta brokers to merely typing orders, but eventually froze them out of trading altogether and controlled trading himself. During this time period, Stanley Cohen also orchestrated strategies for "marking the close," essentially a manner of manipulating stock prices to artificially high prices as the market closed, with the result that the last trade on any given stock, which is the price reported to the public, would artificially reflect a high value, and thus enhance the firm's inventory as well as the accounts of those customers holding such stocks. In the aggregate, such manipulated trades can result in high false values and have an effect on transaction decisions when the market reopens. Several witnesses testified that Stanley Cohen directed this strategy.

When Holmquist and Kishpaugh objected, Stanley Cohen directed them to do as they were instructed. Both brokers reported the transgressions to Spehler, who directed them to comply with Stanley Cohen's directives; on at least two occasions, Spehler gave these instructions in writing. When Kishpaugh argued that Stanley Cohen's brokerage fees were excessive under the NASDAQ rules, Stanley Cohen responded: "Mind your own business. We know what we're doing. It's my money. I'll do what I want." Kishpaugh alerted Spehler, but to no avail. Holmquist declined to participate.

Stanley Cohen also apparently started to keep tabs on Spehler, even directing a full accounting of Spehler's books and the

checks he wrote. Several witnesses testified regarding other improprieties, such as "crossing the stock," and a "no net sales" policy, which essentially obstructed sell orders to ensure that the firm was not holding unsold stock that might deflate the value of its inventory. Specifically, Stanley Cohen instructed brokers that they were not to execute a customer's sell order until the broker had "crossed" or found a buyer for the corresponding number of shares. If no in-house buyer was found, the broker had to buy the shares himself or herself. Again, several witnesses testified that Stanley Cohen blatantly orchestrated these strategies and required his brokers to comply. These activities clearly violated securities laws.

When the Atlanta brokers refused to comply, they were taken to task by Stanley Cohen, and eventually forced out of the firm by Spehler. Holmquist was even sued at Stanley Cohen's direction when Holmquist executed sell orders in contravention of Stanley Cohen's policy; the lawsuit was withdrawn by Spehler, but Holmquist was forced to resign.

Numerous witnesses testified to Stanley Cohen's control over not only trading strategies and policies, but also countless day-to-day management and financial matters. All checks had to be authorized by Stanley Cohen, who then had Adam Cohen sign them, and Stanley Cohen authorized payment of all fees, even Spehler's own broker fees. However, he established his own remuneration, giving himself compensation of $245,558 in 1996. Stanley Cohen even stopped payment on a check to one of the firm's attorneys after asserting his authority to do so as head of the retail sales division, and contending that his division, rather than Spehler, had been generating the firm's income. When Spehler authorized a raise for an employee, Stanley Cohen cancelled it. He directed changes in the firm's health insurance and directed that premiums thereafter would be deducted from brokers' commissions. During this time period, Stanley Cohen was directly responsible for firing more than 15 employees, and he personally interviewed numerous potential employees.

At the end of 1996, Stanley Cohen's daughter, defendant Jamie K.C. Scher, joined Renaissance as in-house counsel, after which time she managed the firm's legal affairs. She became a licensed broker herself in 1997. In June 1996, Steven Cavanaugh was hired as compliance officer; he resigned a few months later, at which time Spehler assumed responsibilities for compliance, after which Edward Rumph was hired as compliance officer, but he also resigned after a few months.

One might suspect a red flag when an operation's compliance officers swiftly resign in sequence. In any event, the record provides a more complete picture of why they left, and further underscores the common knowledge that Stanley Cohen was running the operation. The record indicates that Stanley Cohen threatened to fire Cavanaugh, and publicly screamed at him when Cavanaugh tried to initiate some garden-variety compliance initiatives. Stanley Cohen's response was predicated on his directive that, as Cavanaugh's supervisor and as a partner in the firm, he had to preapprove any new procedures. He then isolated Cavanaugh from the firm's operations personnel. When Rumph assumed compliance responsibilities, Stanley Cohen indicated that he would fire Rumph for proposing new methods of auditing the firm's trading practices. Although Spehler had responded favorably to the proposal, Stanley Cohen overrode him.

Needless to say, during this time period, Stanley Cohen was still banned from even participating in trades except under supervision, let alone co-opting an entire retail sales operation and reshaping it in his own interests. This, alone, would have subjected him to NASD action. However, he and his codefendants also engaged in a pattern whereby they affirmatively sought to deceive both NASD and New York State regarding registration requirements. Stanley Cohen, who was required to obtain NASD approval to be hired as a precondition to undertaking any new position, never received NASD approval, and in fact never even applied for such until 18 months after being hired by Renaissance. During this time period, Cavanaugh, as compliance officer, warned Stanley Cohen and Spehler on several occasions that Stanley Cohen was required to register with NASD. The firm also failed to identify him as a principal in its registration materials, in violation of NASD rules. Cavanaugh, again, warned that Stanley Cohen had to be registered as such, but even after Spehler conceded that Stanley Cohen acted in more than simply a ministerial capacity, and Cavanaugh filled out the paperwork, Stanley Cohen directed him not to send it in. Subsequently Rumph, noting the impropriety of Stanley Cohen functioning in a supervisory capacity without registering, in view of his past violations record, noted that the NASD had to be informed and registration obtained. Spehler initially agreed, but Stanley Cohen, again, overrode him. Subsequently, Stanley Cohen obliquely threatened Rumph. Nor did the firm identify Stanley Cohen to NASD as a broker with a violations record.

By April 1997, an attorney for the firm (the same one whose fee was refused by Stanley Cohen) had informally asked NASD about Stanley Cohen's role in the firm, and was advised that it was improper; he passed this information to Stanley Cohen and Spehler. Meanwhile, correspondence to customers concealed Stanley Cohen's role, and the firm misrepresented to customers that it was in compliance with NASD rules.

In September 1997, Stanley Cohen finally filed an NASD registration form, which he and Spehler both signed, attesting that in his employment with Renaissance, Stanley Cohen had not had any employment-related involvement with customers or with securities trades. Renaissance also submitted an application, identifying Adam Cohen as Stanley Cohen's supervisor, for Stanley to be approved as a Renaissance broker. The NASD, little suspecting the actual extent of Stanley Cohen's own control of the operation, responded that in view of his previously having been barred from securities transactions, he could not be supervised by his son. In a subsequent revised application, the firm's office manager, Eileen Torrillo, was identified as Stanley Cohen's supervisor. In this revised application, which Spehler signed, Stanley Cohen was described as merely performing clerical responsibilities for trades and that the trades were actually executed by the brokers in the Atlanta office; by this time, though, those brokers had already left Renaissance employment.

An NASD representative immediately contacted, among other persons, Rumph, Jamie Scher and Adam Cohen, indicating that Stanley Cohen's presence was a serious problem and that he had to leave the premises immediately. Adam Cohen and Jamie Scher indicated that their attorney had advised them that Stanley Cohen's responsibilities were proper and they declined to comply. The attorney to whom they referred, though, was the very one who had questioned the NASD in the first place and relayed the information regarding the impropriety of Stanley Cohen's presence and who certainly had not provided the advice for which he was now being quoted. When Rumph later indicated his belief that he had to report Stanley Cohen's unlicensed presence at Renaissance, Scher warned him not to, and, in an obviously veiled threat, to be sure that he never said anything about Stanley Cohen that he could not prove. The NASD representative then initiated an investigation and later testified that this was the most egregious violation she had ever seen of a formerly banned broker acting as a disqualified broker for a firm.

In October 1997, NASD investigators visited Renaissance in order to ascertain Stanley Cohen's role. Spehler and Adam Cohen asserted that Stanley Cohen was only a consultant. When pressed to produce an IRS 1099 form showing the reporting of consulting fees, none was produced; rather, a W-2 form was located which identified Stanley Cohen as an employee who, curiously, had earnings that exceeded Spehler's. As the investigators arrived, Stanley Cohen had been in the trading room, from which he quickly disappeared out the back door. Various brokers testified that Adam Cohen thereafter assumed his father's prior spot. Interestingly, Adam Cohen did not even know how to operate the computer system at his father's spot that Stanley Cohen had so nimbly operated, and always communicated with his temporarily absent father by telephone regarding trades. Stanley Cohen then hired Bruce Katz, his brother-in-law, ostensibly as a cold caller, but instructed him to be his "eyes and ears" at the firm and to report directly to him all that occurred.

In December 1997, Stanley Cohen directed Eileen Torrillo to file the paperwork that would be required for Adam Cohen to open his own firm. She was the office manager, who had been identified as Stanley Cohen's supervisor in his revised application. The NASD approved a license for a new firm in February 1998. In March 1998, the new firm, AJC Equities, became Renaissance's alter ego. In one day, signage was changed, and operations and personnel were switched to the new firm, which continued operating at the same premises. The exception was that Spehler was omitted from the new firm. The Cohens appointed Torrillo as compliance officer. AJC then constructed a wall so as to separate an office of the leased premises from the AJC operation, placed a new sign over its door indicating it was the office of "Meyer & Scher," and promptly gave Stanley Cohen, but not Scher, a desk therein and a telephone and computer hookup to the AJC offices. Katz continued to report his numerous daily observations to Stanley Cohen, and Torrillo continued to bring him AJC paperwork and pass back his instructions to AJC personnel.

In May 1998, NASD investigators made another surprise visit, this time prompting Stanley Cohen to make a hasty side-entrance exit. He never reappeared, but, having now designated Katz as firm trader, directed trading through Katz.

The NASD in April 1998 requested Rumph to appear at an on-the-record examination. Member firms and their employees must cooperate with NASD investigations and, if requested,

must appear for on-the-record inquiries (NASD Procedural Rules rule 8210). The proceeding may be conducted under oath. Rumph, who had been expressing numerous concerns about Stanley Cohen's role but had consistently been told that Stanley Cohen was acting properly, solicited Spehler's advice before appearing in the NASD proceeding. Spehler carefully told Rumph to tell the truth, but only to tell the NASD "things that you can prove." Spehler explained that he could not prove mere opinion, noted that Adam Cohen was listed on firm letterhead as the head trader and, in response to Rumph's contention that he had actually seen Stanley Cohen trading, suggested that Rumph had only seen Stanley Cohen performing clerical functions. Rumph thereupon informed the NASD that Adam Cohen was the head trader, which he later acknowledged to the NASD was false.

The NASD then summoned several Renaissance/AJC employees to testify, prompting a meeting called by Adam Cohen and Jamie Scher prior to the proceeding. Adam Cohen complained that the NASD investigators were "bad" and were "just busting my chops," and stated, carefully, that they should "tell the truth and you'll be okay." He then explained what "the truth" was. He explained the formal chain of command at the operation, reminding them that he himself "ran retail" and was the head trader, that he telephoned orders to the Atlanta traders, that Spehler owned the firm and ran day-to-day operations, and that Stanley Cohen was a consultant. If they were questioned about Stanley Cohen, they should "just tell them he was a consultant to the firm." Adam Cohen also indicated that he would hire counsel to represent them and that the attorney would be "his eyes and ears" during the interview—which one might reasonably construe to be an implicit threat. When a broker later confronted Adam Cohen, indicating that he knew that Stanley Cohen had done the firm's trades and that he would not lie, Adam Cohen stated, again, that Stanley Cohen was only a consultant. Finally, Adam Cohen threatened the broker that he would be fired if he "didn't go along with this," that a restraining order would be obtained to prevent further contact with customers, that owed compensation would not be paid and that the broker's license would be "marked" so as to inhibit further employment. Adam Cohen then directed this broker how he would testify, and on a daily basis thereafter walked him through what he would say. Other brokers and employees, who were also instructed how to handle potential claims of crossing

stocks and other improprieties, subsequently got the same treatment. As a result, several of them testified falsely before the NASD, after which they were complimented by Adam Cohen.

These employees were then recalled to the NASD in order to answer charges that they had lied under oath. Adam Cohen provided assurances to the broker alluded to above, who had consistently suffered pangs of conscience, that perjury was very hard to prove. However, Adam Cohen warned him that he should remember that an admission of perjury would cost him his license, and that he would be barred from the industry and thereafter be burdened with a criminal record. Another anxious broker was told that Adam Cohen would pay legal counsel, but the lawyer turned out to be Scher. The extent of the legal counseling was Scher's advice that the broker "tell the truth; tell them Stan was a consultant," and that, insofar as this is what everyone had already said, it was "no big deal." Adam Cohen later told another employee that if they all "stuck together," then "it's our word against theirs." Adam Cohen and Jamie Scher then coached other employees how to respond to questions along the lines already established, and alerted them not to respond to questions to which they did not specifically know the answer. Jamie Scher then provided examples of what they might not know: they did not know what Stanley Cohen's day-to-day job was, but only saw him in the parking lot, or at the soda machine, and not generally around the office, and they did not keep track of his comings and goings. She also warned that they should keep the answers vague rather than try deflecting questions with implausible responses. Each of these employees then testified falsely. Several of the employees were subsequently convicted of perjury and fraud-related offenses, and testified against the present defendants pursuant to cooperation agreements.

Defendants then testified under oath before the NASD. At the criminal trial resulting in the instant conviction, Stanley Cohen contended, and still maintains, that an oath was never administered in connection with his participation and hence perjury had not occurred. We reject the contention, as did the trial court.

NASD investigators Marilyn Schwartz and Howard Davis testified at trial that Stanley Cohen had appeared for an on-the-record interview, with Schwartz testifying that her regular practice was to adduce sworn statements. Court Reporter Robert Bloom, who recorded the interview, is a New York notary who ordinarily would administer the oath. Although the actual

recitation of an oath does not appear on the record, Bloom testified that he administers the oath as a matter of course and that in each of nine other NASD interviews involving Renaissance employees, he had administered an oath. However, he did not specifically remember having administered the oath to Stanley Cohen, nor did his steno notes indicate such. Investigator Schwartz, though, specifically recalled that Bloom had administered an oath to Stanley Cohen, and even remembered his responses and demeanor at that time, an observation confirmed by other witnesses. Stanley Cohen's appearance stood out in their memories insofar as Stanley Cohen was the central figure of a lengthy investigation. Schwartz, in particular, had a specific recollection of Stanley Cohen being sworn in because she remembered "the thought that I was watching the Mayor being sworn in." Stanley Cohen had previously been the mayor of Great Neck Estates, New York. Investigator Davis recalled that Stanley Cohen initially put up his left hand to be sworn and then switched to his right hand. Accordingly, we are well satisfied by this record that Stanley Cohen gave sworn testimony, an essential element of his conviction for perjury.

The evidence otherwise was also legally sufficient and the verdict was not against the weight of the evidence. In his testimony, Stanley Cohen denied having traded stocks or that he executed trades, or having been involved with making a market for any securities. He denied that there was even a need for a head trader at Renaissance, indicated that brokers utilized only a minimal time period while executing orders, obviating the need for a head trader insofar as they could do the work themselves, and declared that "there is no trading at Renaissance, that is not their business." Nevertheless, Stanley Cohen asserted that after the Atlanta office ended operations, Adam Cohen was designated as the firm's trader.

Stanley Cohen maintained that the brokers interacted only with Adam Cohen, who approved and executed all orders. Stanley Cohen claimed never to even talk to the brokers but that he would only, at Adam's direction, perform the clerical duty of writing out tickets. His only motivation in being on the premises was that he "just enjoyed being around the business," and that as a consultant, he reviewed procedures and recommended changes, ensured that broker fees were appropriate, alerted Spehler to irregularities, but never made decisions in these regards.

Stanley Cohen denied being a principal of the firm, or acting in a supervisory capacity, or that anyone ever reported to him,

or being involved in hiring and firing, or being involved in any salary decisions, or using the firm's computers that were used for trading (even claiming to be generally incompetent at computers), or directing anyone else to enter orders on such computers, or directing anyone else to execute transactions. Moreover, he denied "unequivocally" that the firm had ever utilized a "no net sales" policy and in fact denied even knowing what the phrase meant. He also "absolutely" denied having directed brokers to cross the stock, and denied that Renaissance had any stock crossing policy for stocks in which it had made a market. If he did anything wrong, it was because of bad advice from counsel (i.e., the same attorney who had warned him about irregularities and who had been deprived of a fee by Stanley Cohen). Each of these statements is flatly contradicted by voluminous trial evidence.

Jamie Scher testified under oath before the NASD that Adam Cohen was Renaissance's only New York trader, that Stanley Cohen acted only as a consultant to Spehler and that she was not aware of him having any other responsibilities. She denied that he traded stock or made any significant decisions. She conceded that there had been a meeting prior to employees testifying before the NASD, but indicated that Adam Cohen had only offered to provide legal counsel. For her part, she only advised them to "be honest . . . Whatever your interpretation is, whatever you know the truth to be is what you must state . . . ." Scher was apparently very good at taking her own advice on the subject of answering questions under oath. She could not remember what else was discussed, including whether any employees had raised questions about Stanley Cohen's position with the firm. Adam Cohen "might have" referred to Stanley Cohen as a consultant, but when pressed as to the context in which this description was elicited, she recalled that he had only "generally" mentioned it as Stanley Cohen's job title. When asked whether she ever saw anyone but Adam Cohen in the trader's chair, Scher queried whether the examiner had "anybody else in mind." However disingenuously crafty her responses, though, her testimony, in toto, is clearly belied by the trial evidence.

Spehler next testified under oath that after April 1997, Adam Cohen was head trader. Spehler detailed what that position involved—in short, Adam Cohen exercised all responsibilities involved in trades. Spehler testified emphatically that Adam Cohen "controlled the firm. There wasn't a person that walked,

talked, said yes, no, boo, without it going through Adam." By contrast, Stanley Cohen essentially did nothing, and, specifically, none of the things that Adam Cohen did. Stanley Cohen performed only clerical tasks, checked paperwork for mistakes, helped move boxes around the office, and really did not get more involved than this. Interestingly, Stanley Cohen earned some $250,000 in 1996 for doing nothing of any importance. Spehler, who allegedly authorized payment to Stanley, gave no explanation for Stanley Cohen's exorbitant compensation. Spehler's testimony, needless to say, does not have the ring of truth.

Adam Cohen, the designated head trader testified last. He was a self-described very busy man and manifestly a very important person. In addition to servicing his own 440 accounts, and supervising all of the other brokers, Adam Cohen had to take over the trading operation in April of 1997 (i.e., after the Atlanta brokers were squeezed out). He was the sole trader, and described how all activity had to be authorized by him. He also described himself as being managing partner, and even president, but he was strangely unfamiliar with the flow chart outlining various persons' positions. His father, of course, did nothing, except consulting. When asked what that meant, Adam Cohen indicated that he "would love to" elaborate, but insofar as Stanley Cohen worked for Spehler, he did not really know what his father did. This from the "managing partner" and "president" who basically mastered all operational details and held them within his own firm grip. When pressed, he allowed that his father did "clerical" work, and was "the kind of guy that . . . would mop the floor if you asked him to . . . ." To give credit where it's due, ample testimony did suggest that Stanley Cohen, if crossed, would "mop the floor"—with whomever crossed him. Stanley Cohen also would "sweep the floor, [he] swept the floor in the office," if Spehler asked him to. Adam Cohen then continued with the usual litany of what Stanley did not do: decisions, trading, operations and management, personnel decisions, etc.

Although Adam Cohen admitted having met the prospective NASD witnesses from the firm prior to their interviews, he advised them only to tell the truth, promised to cover their legal expenses, and denied having directed them to testify that Stanley Cohen was a consultant. One might surmise that this testimony was carefully tailored to interlock with that of the other targets of the NASD investigation, and was similarly in-

consistent with the trial evidence adduced from numerous witnesses.

Criminal charges were subsequently filed and defendants were each convicted, after a jury trial, of several counts of first-degree perjury. In addition, defendant Stanley Cohen was convicted of two counts of fraudulent securities practices in violation of the Martin Act (General Business Law § 352-c [5]). Defendants Adam Cohen, Stanley Cohen and Todd Spehler are on bail pending appeal.

Defendants moved before trial to dismiss the perjury counts, and after trial sought dismissal pursuant to CPL 330.30. In two thoughtful and comprehensive decisions, the trial court rejected defendants' challenges to the perjury prosecution, reasoning with which we agree. The trial court did dismiss several fraud-related charges and a conspiracy charge on various theories.

■ We turn, first, to jurisdiction. Defendants direct us to *Thomas v Loney* (134 US 372 [1890]), an 1890 Supreme Court perjury ruling that defendants construe to be binding precedent for the proposition that an oath given in a proceeding involving federal law cannot be the basis for a state perjury conviction. However, that is not quite the proposition asserted in *Loney*, nor are the peculiar circumstances undergirding *Loney* remotely analogous to either the present factual or legal contexts. The *Loney* prosecution was predicated on a state perjury charge arising from the defendant's deposition conducted before a state notary public involving a contested congressional election. The Supreme Court noted that despite the trappings of state authority conferred by the fact of a state licensed notary, the oath was required to be administered only by virtue of federal, and not state, law. The entire point of the deposition concerned a congressional matter, with Congress acting in its constitutionally conferred quasi-judicial capacity to adjudge the election of its members. The deponent's state had no interest in the matter, and its laws did not require that the oath be administered. Insofar as an oath had to be administered in connection with the taking of deposition testimony, though, the services of a person authorized to do so were required. The notary was state licensed, a happenstance that did not convert enforcement regarding a federally required oath into a state matter that could give rise to a state perjury charge. Hence, *Loney* does not apply.

Defendants also argue that this case involved a federal investigation by a federal entity from which exclusive federal ju-

risdiction flows. Preliminarily, the NASD is a private entity incorporated under the laws of Delaware (*Jones v Securities & Exch. Commn.*, 115 F3d 1173, 1173 [4th Cir 1997], *cert denied* 523 US 1072 [1998]). Unlike *Loney*, where the proceeding was before an exclusively federal entity and the oath was authorized solely by federal law, the NASD is not an exclusively federal tribunal, nor was it acting solely pursuant to federal law when it investigated defendants' actions. Rather, NASD is a self-regulatory body that protects both federal and state interests in policing the securities industry. The State of New York therefore has jurisdiction to prosecute the crime of perjury committed within the State of New York, though before the NASD. By way of comparison we note that Justice Fried dismissed state perjury charges in an unrelated case involving perjury before the SEC, an undisputed federal agency, which violated the federal perjury statute, and which thus exclusively vested jurisdiction in federal court (*People v D.H. Blair & Co.*, 2002 NY Slip Op 50152[U]), factors against which the present case stands in contrast.

Spehler also argues, though, that the NASD acts as a federal tribunal in that it enforces federal securities laws, and that basic tenets of federalism require dismissal. The NASD has consistently been recognized by federal courts to be a private nongovernmental entity (*see D.L. Cromwell Invs., Inc. v NASD Regulation, Inc.*, 279 F3d 155, 162 [2d Cir 2002] [and citations therein], *cert denied* 537 US 1028 [2002]) which self-regulates among its constituent members, albeit subject to oversight by the SEC pursuant to the Maloney Act (15 USC § 78o-3 *et seq.*), in a cooperative arrangement (*see Jones v Securities & Exch. Commn.*, *supra* at 1182-1183 [4th Cir 1997], *cert denied* 523 US 1072 [1998]; *Austin Mun. Sec., Inc. v National Assn. of Sec. Dealers, Inc.*, 757 F2d 676, 680 [5th Cir 1985]) so as to avoid governmental regulatory overreach. We agree with the trial court that just as there is no legal basis to construe the NASD to be a federal agency, there is no de facto basis to construe that the NASD enjoys some measure of federal sovereignty by virtue of SEC oversight and the NASD's necessary reference to federal laws. Hence, as the trial court put it, "[w]hile Congress certainly provided for comprehensive Federal regulation of the securities industry, and charged [self-regulatory organizations] with the duty of self-regulation, the fact that the NASD is subject to extensive oversight by the SEC, and ultimately Federal court review, does not metamorphose the NASD into an organ of the Federal Government" (187 Misc 2d 117, 122 [2000]; *see also Perpetual Sec., Inc. v Tang*, 290 F3d 132, 137-138 [2d Cir 2002]).

Further, it has long been clear that the mere fact of intrusive governmental regulation that circumscribes a private entity's scope of operations does not by virtue of that regulation convert the private entity into a state actor (*Jackson v Metropolitan Edison Co.*, 419 US 345 [1974] [intrusive regulation does not make a utility's private action, such as terminating a customer's service, state action]). Pursuant to the Maloney Act, Congress, without surrendering the SEC's regulatory and enforcement powers, nevertheless allowed the securities industry to regulate itself. This alternate, privatized, means of self-regulation was intended in part to relieve federal regulatory authorities from the burden of exclusively controlling the manner and methods of securities trading while still ensuring accommodation with the goals of the Securities Exchange Act. Yet self-regulating organizations such as the NASD are not mere alter egos of the SEC; the NASD need not exclusively reference the federal statute or the SEC regulations in its actions, but may also formulate ethical standards binding on constituent members that exceed federal law (*Austin Mun. Sec., supra* at 680; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v National Assn. of Sec. Dealers, Inc.*, 616 F2d 1363, 1367 [5th Cir 1980]; *Jones v Securities & Exch. Commn., supra* at 1182; *see also* Norman S. Poser, *Reply to Lowenfels*, 64 Cornell L Rev 402, 403 [1979]). In that sense, the NASD not only performs the salutary service of ensuring that members comply with the letter of federal law, but also pursues the self-interest of preventing fraudulent and manipulative practices so as to protect members, investors and the public interest (*United States v National Assn. of Sec. Dealers, Inc.*, 422 US 694, 700 n 6 [1975]; *Jones v Securities & Exch. Commn., supra* at 1182).

Hence, while there is an interplay with the SEC, it is not necessarily a symmetrical one: the SEC enjoys the power to approve NASD rules, and those rules may expand beyond the requirements of federal law, but it also has the correlating power to veto the NASD; SEC rules may also expand beyond those promulgated by the NASD (*United States v National Assn. of Sec. Dealers, Inc.*, 422 US at 700, 710 n 19; *Jones v Securities & Exch. Commn.*, 115 F3d at 1182).

Thus, we reject the claim that the NASD is the functional equivalent of a federal entity. Moreover, as also previously noted, the NASD interfaces with state securities regulators, too, thus acting with reference to state securities laws. Hence, this substantial NASD involvement with the several states, and in

the present case with New York law, further undermines any characterization of the NASD as being the creature and expression of federal sovereignty.

Defendants' claim that state jurisdiction runs afoul of the principles of federalism is equally unavailing. It has long been recognized that, in order to sustain a claim that the state's jurisdiction has been preempted by federal law, the defendant must show a clear and unambiguous intent of Congress to do so: "There can be no presumption that state authority is excluded from the mere fact that congress has legislated" (*People v Welch*, 141 NY 266, 273 [1894]). Thus, the existence of a federal perjury statute does not preclude a state prosecution for perjury involving the same act (*see People v Materon*, 107 AD2d 408, 411 [2d Dept 1985]). Indeed, *Loney* recognized that state and federal authorities, in many instances, have concurrent jurisdiction to prosecute the same act, and its ruling was limited to those instances where the oath was "authorized to be administered by the laws of the United States, and by those laws only" (134 US at 374). Here as noted, the NASD simultaneously enforces both federal and state securities laws, and there is no inherent conflict between federal and state laws governing the securities industry. Thus, we can dispose of this novel theory of federalism as urged by defendants.

On appeal, though, defendants also advance an additional, nuanced, theory that New York is without power to enforce perjury committed before the NASD insofar as the NASD's power to enforce New York's broker registration requirements is conferred by the federal Maloney Act (15 USC §§ 78f, 78k, 78s). Returning again to *Loney*, defendants urge that it compels the conclusion that the jurisdictional issue is governed by the source of the authority pursuant to which the oath is administered rather than just the particular forum in which the oath is administered, so that even if we were to find that the NASD is not a federal entity, the NASD's power delegated under federal laws to require an oath creates exclusively federal jurisdiction pertaining to perjury committed in an NASD proceeding. Again, though, *Loney* is easily distinguishable, defendants' application of *Loney* to these facts is unduly elastic and the argument is ultimately sophistic. It must be recalled that whatever the ultimate authority allowing the NASD to take testimony under oath, the NASD does not serve exclusively federal interests, but also references state law, most notably enjoying delegated authority to enforce New York's broker registration require-

ments (13 NYCRR 10.1 *et seq.*) and serves the interests of its constituent members. Thus, the power delegated to the NASD to enforce compliance with state securities regulations is substantive and not merely procedural. Indeed, in conducting the on-the-record hearings pursuant to NASD rule 8210, the NASD was investigating Stanley Cohen's failure to register and his role at Renaissance in general (leading to charges of securities fraud in violation of New York's Martin Act).

Turning to the evidentiary challenges, perjury in the first degree requires proof that a defendant swears falsely, and that the false statement consisted of testimony that is material to the action, proceeding or matter in which it is made (Penal Law § 210.15). Swearing falsely requires that the defendant intentionally makes a false statement that he or she does not believe to be true, while giving testimony (Penal Law § 210.00 [5]; *see generally* 9-84 New York Criminal Practice § 84.2 [Perjury and Related Offenses] [Matthew Bender & Co.]). The evidence set forth above is replete with false statements knowingly, and even brazenly, made by all defendants, so that legal sufficiency is easily established. Moreover, under the standard canons of appellate review of whether a verdict is against the weight of the evidence (*People v Bleakley*, 69 NY2d 490, 495 [1987]), and giving due deference to the jury's findings, including its evaluation of the credibility of the numerous witnesses (*id.*; *People v Quintana*, 287 AD2d 269 [2001], *lv denied* 97 NY2d 687 [2001]; *People v Messina*, 227 AD2d 312 [1996]), we find no reason on this record to disturb the verdict. As to Jamie Scher's contention that her NASD testimony regarding what had transpired at the strategy meeting prior to the NASD interviews of the Renaissance brokers was not materially false, the claim is not only unpreserved, but is meritless. The record actually shows that more than being evasive, she unequivocally denied that Adam Cohen had indicated to participants how they should describe Stanley Cohen's role at the firm. The jury was free to consider the substantial evidence to the contrary and to conclude that she thereby lied.

Stanley Cohen's Martin Act convictions arise from charges that he directed an operation that was "marking the close," and by "crossing" stocks had utilized a "no net sales" policy in violation of General Business Law § 352-c [5]). This section prohibits securities fraud involving an ongoing course of conduct with the intent to defraud 10 or more people, with the result that property is thereby obtained from at least one person. Evi-

dence at trial showed that Renaissance was a market maker in shares of ObjectSoft and Intellect Communications. Basically, the evidence in this case demonstrates the manipulation of these stock prices, which induced stock purchases, with a financial windfall enuring to the benefit of the firm and its principals, notably Stanley Cohen, and losses suffered by trusting investors.

A broker-dealer that makes a market in the stocks of a particular company keeps an inventory of shares in the firm's in-house account. If there are more market orders to sell than to buy a particular stock, the stock's price will fall and the firm's inventory will lose value. To manipulate the price and keep it artificially high, traders can set a "no net sales policy" with regard to these shares. Here, brokers were directed either to find an in-house customer to buy the stock or to convince the seller to hold the sell order. As part of this policy, Stanley Cohen and Adam Cohen encouraged brokers to persuade customers with sell orders not to sell their ObjectSoft stocks. Holmquist and Kishpaugh, who resisted Stanley Cohen's demands along these lines and were punished for doing so, testified, as did various other employees, as to how these strategies worked and established that they were implemented and demanded by Stanley Cohen. The employees included several brokers as well as Jamie Ceglia, who initially had been a receptionist and then was Stanley Cohen's assistant. Ceglia's testimony was important, as will be noted, in that she was present at relevant times and yet cannot reasonably be characterized as an accomplice. These various witnesses also established that the strategies had been utilized dozens if not hundreds of times, and that investors were thereby defrauded and lost money.

An investor, Thomas Lamm, testified that when his 20,000 shares of stock in a company for which Renaissance was making a market dropped in value, he directed one of the Renaissance brokers to sell. The broker, who testified that he had been acting pursuant to Stanley Cohen's no net sales policy, discouraged him from selling, indicated the price drop was only temporary, and even advised Lamm that he might not even be able to sell for $1 per share. Lamm thus was dissuaded from selling by a broker, acting at the behest of Stanley Cohen, who basically would not accept the sale. When Lamm finally sold later, he lost $6,000. Brokers testified that they were even directed to try to induce skittish investors, by means of hints, representations and other stratagems, to buy more of the stock, thereby enhanc-

ing its value. Another investor, Dr. Michael Groen, similarly suffered a significant loss when shares of stock from the same company in which Renaissance was making a market depreciated to about a third of their value. During this time, Groen also had tried unsuccessfully to get a Renaissance broker to sell. Dr. Groen testified that if he had known that stocks were being crossed or that there was a no set sales policy in place, he would not have purchased the stock through Renaissance. Another investor, Joseph Herring, provided similar testimony. The fraudulent scheme and Stanley Cohen's orchestration of it were proved.

Moreover, the evidence amply establishes that at Stanley Cohen's behest, the firm's brokers "marked the close," artificially and fraudulently enhancing the apparent value of the stock as trading was supposed to stop, thereby inducing stock transactions made in reliance on artificially inflated prices. As noted previously, to accomplish this scheme, small numbers of shares are sold for an artificially high price at the close of the market so as to cause the price of that transaction to be reported the closing price of the stock. Stanley Cohen's additional claim that the evidence of this particular charge is legally insufficient in that he did not thereby take property from customers is unpreserved for review, and we find no reason to reach it in the interest of justice. Even if we were to reach the merits, we find this argument to be without merit. The People introduced into evidence the account statements of various Renaissance customers which showed that these customers invested thousands of dollars in ObjectSoft stock and paid Renaissance large commissions. Stanley Cohen argues that there is no evidence that he obtained property because the mere 100 shares traded at the close did not change the firm's bid or asked price on the stock. However, while the bid or asked price did not change, the stock's value in the marketplace changed, thereby affecting customers' decisions on whether to buy, hold or sell the stock.

Stanley Cohen also contends that these securities fraud charges are legally insufficient insofar as no corroborative evidence was provided independent of accomplice testimony (CPL 60.22; *People v Cobos*, 57 NY2d 798, 801-802 [1982]). This claim, too, is unpreserved for review, and is also meritless. Although an accomplice corroboration argument might hold as to various brokers, it is manifestly inapplicable to testimony provided by Kishpaugh and Holmquist, as well as Ceglia, who had a strictly clerical capacity (*see e.g. People v Macellaro*, 138 AD2d 748

[1988]; *People v Spiegel*, 60 AD2d 210 [1977], *affd* 48 NY2d 647 [1979]). Hence, nonaccomplice testimony together with documentary evidence presented at trial amply corroborated the extensive and internally consistent testimony by the brokers that established the wrongdoing and Stanley Cohen's role in it.

Finally, the several defendants assert that their sentences are unduly harsh. To the contrary, in view of the extensiveness of the fraud scheme, the threatening tactics that were utilized to coerce participants, the brazen dishonesty employed to coerce employees to lie under oath, and the consistent and well-orchestrated scheme of deception employed by these defendants to contravene securities laws implemented to protect the general public and to deceive the NASD, and their general lack of remorse, there is absolutely no reason to disturb the sentencing court's sound exercise of discretion (*see People v Rios*, 241 AD2d 350 [1997], *lv denied* 90 NY2d 909 [1997]; *People v Dauphinee*, 240 AD2d 222 [1997], *lv denied* 90 NY2d 892 [1997]).

Accordingly, the judgments of the Supreme Court, New York County (Bernard Fried, J.), rendered February 5, 2002, convicting Adam Cohen, Stanley Cohen and Jamie Scher, after a jury trial, of six counts, four counts and five counts of perjury in the first degree, respectively, and Stanley Cohen of two counts of securities fraud in violation of General Business Law § 352-c (5), for which they were sentenced, respectively, to six months incarceration and five years probation in addition to a $10,000 fine and 1,000 hours of community service (Adam Cohen); 1¹/₂ to 4¹/₂ years and a $15,000 fine (Stanley Cohen); and five years probation and a $10,000 fine and 1,500 hours of community service (Jamie Scher); and the judgment of the same court and Justice, rendered January 25, 2002, convicting Todd Spehler, after a jury trial, of three counts of perjury in the first degree, for which he was sentenced to a term of six months incarceration, a $5,000 fine and 500 hours of community service, should be affirmed. As to defendants Adam Cohen, Stanley Cohen and Todd Spehler, the matters are remitted to Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (5)

SAXE, SULLIVAN, LERNER and FRIEDMAN, JJ., concur.

Judgments, Supreme Court, New York County, rendered February 5, 2002, and judgment, same court, rendered January 25, 2002, affirmed.