[846 NYS2d 44]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v L. DENNIS KOZLOWSKI, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK H. SWARTZ, Appellant.

First Department, November 15, 2007

## APPEARANCES OF COUNSEL

*Martin & Obermaier*, New York City (*John S. Martin* of counsel), *Stephen E. Kaufman, P.C.*, New York City (*Stephen E. Kaufman* and *Andrew Kaufman* of counsel) and *Bryan Cave, LLP*, New York City (*James R. DeVita, Austin V. Campriello, Beth Brandler, Cari Sommer* and *Kathryn E. Gebert* of counsel), for L. Dennis Kozlowski appellant.

*Stillman, Friedman & Shechtman, P.C.*, New York City (*Nathaniel Z. Marmur, Michael J. Grudberg, Lara A. Shalov* and *Mary Margulis-Ohnuma* of counsel), for Mark H. Swartz appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Amy-jane Rettew* and *Gina Mignola* of counsel), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

The convictions at issue arise out of the prosecution of defendants L. Dennis Kozlowski and Mark H. Swartz, who were respectively the CEO and CFO of Tyco International, a multinational public corporation, for allegedly engaging in large-scale self-dealing and drawing on Tyco's treasury, as they saw fit, for their own personal use, including investments, luxuries and expenses. They allegedly accomplished this by abusing corporate procedures while keeping the directors and shareholders in the dark. Allegedly, they stole more than $100 million in three "bonus" larcenies in 1999 and 2000 and many millions more in other thefts until their enterprise began to unravel in January 2002, when Tyco's board learned that defendants had made a secret $20 million payment to a supposedly independent director. In June 2002, Kozlowski abruptly resigned and left Tyco after being indicted by a New York County grand jury. A

few months later, in September, both defendants were charged in a second indictment with several counts of first degree grand larceny, multiple counts of falsification of business records, securities fraud and conspiracy, leading to a conviction after trial.[1]

■ Defendants raise a host of issues. Contrary to their arguments, the larceny convictions relating to bonuses were based on legally sufficient evidence and were not against the weight of the evidence. The evidence amply supports the conclusion that defendants took unauthorized bonuses from Tyco in 1999 and 2000. As neither defendant disputes, only Tyco's compensation committee, acting as a whole, had the authority to grant them any compensation. Every member of that committee, with the exception of Philip Hampton, who had died early in 2001, before the trial, testified to never having heard of these midyear payments, much less to having voted approval. As the compensation committee minutes show, neither the August 1999 $37.5 million reduction of defendants' massive Key Employee Loan Program (KELP) balances, run up during the first three quarters of that fiscal year, nor the August 2000 TyCom IPO bonuses—$32 million for Kozlowski and $16 million for Swartz—in the form of a loan reduction plus tax gross-up (additional benefit to cover taxes), nor the November 2000 ADT Automotive bonuses—$16 million for Kozlowski and $8 million for Swartz, was authorized.

As the record shows, there were no references to any of these multi-million-dollar payouts in the materials prepared for the committee, no resolutions approving these bonuses in the staff minutes prepared for the committee, and no reference to bonuses in the committee's reports to the board.[2] Before either defendant could receive a bonus, the compensation committee had to certify that the performance goals had been satisfied. Since Tyco's fiscal year ended on September 30, this certification usually occurred in early October. Most notably, Tyco's annual proxy statements, prepared under defendants' supervision, failed to indicate even the most oblique reference to their multi-million-dollar midyear bonuses. This documentary void revealed more than a few isolated "procedural irregularities," as Swartz

---

**1.** At a first trial, the jury was unable to agree because of a lone holdout, and a mistrial was declared.

**2.** While an exhibit to the minutes of the October 1, 2001 compensation committee meeting does certify that certain of defendants' shares vested on June 20, 2001 (the FLAG bonus), the committee did not have the full facts before it when it made this resolution, and defendants did not have the right to vest and sell their shares prior to the resolution.

maintains, or a "fail[ure] to adhere meticulously to all of the niceties of corporate governance," as Kozlowski would have it. Rather this consistent pattern of documentary omission over a period of years constituted powerful evidence of defendants' intentional hiding of these payments from the directors and led inexorably to the jury's conclusion that defendants took these bonuses without permission or authority. The absence of any reference to these transactions in the chain of documentation available to the committee clearly demonstrates defendants' coverup of their thievery.

Defendants' testimonial claims of entitlement—that the bonuses represented early payouts of money that would otherwise have been due them or, at least, that they believed was due them—presented a question of fact for the jury and was, indeed, a hard sell. While the committee could have made midyear payouts if it chose to, such an event would have run counter to Tyco's highly touted pay-for-performance philosophy.

More significantly, though, the entitlement claim was flatly refuted by Mark Foley, the Tyco executive who was responsible for the calculation of the year-end figures on which the annual bonuses were based. In fact, Foley's testimony unequivocally established that defendants received everything they were entitled to under the end-of-the-year formula. Thus, defendants' claims only succeeded in pitting their credibility against that of the committee members and Foley and various other members of their own staff. Defendants even contradicted each other on a number of points. The jury's resolution of this factual issue is amply supported by the weight of the evidence since defendants' self-serving testimony was illogical, internally inconsistent, refuted by Tyco's records and shown to be false by all other witnesses. While defendants assert that their entitlement and good faith claims present a legal sufficiency issue, we cannot discern one except for the 1999 bonus, preserved by the motion for a trial order of dismissal, which we reject.

■ We reject defendants' argument that their conduct with respect to the August 1999 bonuses (counts 1 and 2) did not constitute larceny, but rather, a civil wrong. These bonuses took the form of a reduction of defendants' KELP balances without any tax gross-up, i.e., money, leaving Tyco. As noted, in reaching its verdict, the jury rejected defendants' tale of entitlement, raised after the fact, and accepted the evidence showing that they took the bonuses without approval. The argument that the bonuses awarded to defendants in 1999 and 2000—used

completely in 1999 and partially in 2000 to pay down their KELP loan accounts—show that there was no taking from another, reduces itself to a claim that "all that transpired was the making of certain book entries," a claim that, as the trial court aptly noted, "exalts form over substance." While, indeed, the mere failure to pay one's debts does not constitute larceny (*see People v Yannett*, 49 NY2d 296, 301 [1980]; *see also People v Jennings*, 69 NY2d 103, 127 [1986]), this is not a case of defendants' failure to repay their debts. On the contrary, they did repay their debts, but with money in the form of bonuses that they unlawfully took from Tyco. In 1999, they clearly exercised collectively dominion and control over $37.5 million of Tyco's money and allocated it to their own benefit, precisely the sort of taking that establishes larceny (*see id.* at 118-119).

■ The evidence was legally sufficient to support Swartz's conviction for stealing $1.2 million (count 7), and that conviction is not against the weight of the evidence. Tyco received nothing of value in exchange for the $1.2 million it wired to Swartz's personal account. As the record shows, Swartz had contracted for the purchase of 13 units at the Trump International Hotel and Tower "as a personal investment" and had paid the 10% down payment of $1.2 million with his own funds. Prior to March 1, 2001, the date the $1.2 million of Tyco's funds were wired to Swartz, the seller of the Trump condominium units had already informed the purchaser, a nominee of the undisclosed Swartz, that he was in default for his intransigent refusal to disclose the real buyer's identity, giving the seller the right to keep the $1.2 million down payment. Thus, the jury properly found Swartz guilty of stealing the $1.2 million he paid himself as "reimbursement" for the down payment, for which, as noted, Tyco received nothing in return.

■ The evidence was also legally sufficient to support Kozlowski's conviction for stealing $1.975 million (count 10) for the purchase of three paintings at a London gallery, and that conviction is not against the weight of the evidence. Kozlowski did not have authority to spend Tyco's money on paintings for his personal use. While he had authority to make capital expenditures of up to $200 million without board approval, this authority was to make purchases for business purposes, not personal use. There is no indication of a business purpose for the purchase of these paintings, used to furnish the luxurious Fifth Avenue apartment Kozlowski and his wife occupied and title to which was in his name personally. While Kozlowski had

the paintings listed as assets on Tyco books, the record of this purchase, claimed by Kozlowski to be "appropriate," failed even to mention that paintings were involved; nor was any invoice attached to the wire-transfer form to explain what was being purchased. The form requested that $1.975 million be moved from Tyco to the account of an otherwise unidentified "Richard Green" and noted only that the money was for "Furniture/Furnishings for NY apartment" at "950 5th Ave.," an apartment that was carried on Tyco's books. Interestingly, the directors had no idea that this supposed "Tyco facility" even existed. A jury could find that this mask of legitimacy, created by Kozlowski to justify the money transfer, could not disguise the fact that he was embezzling money from Tyco for his personal use without any intention of ever repaying it.

Defendants' convictions for stealing $8.8 million in or about December 2001 (count 11) and $3.95 million on or about January 3, 2002 (count 12) were sufficiently proven, and those convictions were not against the weight of the evidence. There was no basis for Kozlowski to take Tyco's money in the form of KELP loans to purchase works of art. KELP loans were to be taken to pay taxes on the vesting of restricted stock, not to buy paintings. Given the manner in which defendants misused KELP, one can reasonably infer that Kozlowski did not intend to repay the loans. As for Swartz's involvement, he told Tyco's senior vice-president for finance to charge the art to Kozlowski's account.

The evidence was also sufficient to support defendants' conviction for stealing $20 million (count 13), and the verdict was not against the weight of the evidence. Tyco's bylaws and the testimony of various Tyco directors show that Kozlowski did not have authority to pay an outside director an investment banking fee in connection with Tyco's acquisition of CIT, when that director had advocated the transaction without revealing his interest. This incident, which was ultimately determined to involve criminality at the receiving end of the transaction as well, led to the board's suing the director for return of the payment. As for Swartz's involvement, he authorized the director's invoices to be paid.

Defendants' arguments for overturning the Martin Act conviction (count 15) are unavailing. "[T]o sustain a claim that the state's jurisdiction has been preempted by federal law, the defendant must show a clear and unambiguous intent of Congress to do so" (*People v Cohen*, 9 AD3d 71, 87 [2004],

*lv denied* 2 NY3d 797 [2004], *cert denied* 543 US 927 [2004]). Defendants have not shown such a clear and unambiguous intent. On the contrary, "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions" (*Matsushita Elec. Industrial Co. v Epstein*, 516 US 367, 383 [1996]; *see also* 15 USC § 78bb [a]). As for defendants' claim that the People relied on an impermissible "management integrity" theory of materiality, a fair reading of the People's opening and closing fails to support such a claim.

We reject defendants' arguments that their convictions for falsifying director and officer questionnaires (DOQs) (counts 18-31) are not supported by legally sufficient evidence and are also against the weight of the evidence. The DOQs explicitly state that the person signing them is not required to disclose KELP loans and loans made in the ordinary course of business. As the evidence showed, relocation loans were mistakenly understood at Tyco to be in the ordinary course of business. To be sure, defendants misused both KELP and relocation loans, but citing *People v D.H. Blair & Co., Inc.* (2002 NY Slip Op 50152[U], *57-59 [accurate entry of an unauthorized action is not false]), Kozlowski argues that their answers were accurate and the DOQs were literally true.

In fact, though, while defendants took enormous loans that were listed as KELP or relocation loans, the millions of dollars involved were not spent on taxes or relocation. For example, one year Kozlowski took money to furnish a home in New Hampshire, where he already lived, to buy a multi-million-dollar yacht and $2 million worth of jewelry and to make a series of large personal investments, including an $8.3 million share in a sports partnership. Swartz similarly took money to buy a yacht, to finance the purchase of a second New Hampshire home and to make various personal investments. Defendants never listed any of these loans on their DOQs.

Thus, defendants falsified their DOQs not by omitting KELP and relocation loans, but by failing to list the millions of dollars they took for purely personal loans, which they should never have recorded as KELP or relocation loans in the first place. An exception to the reporting requirement for tax-related KELP loans does not cover loans made to buy a yacht. Nor does an exception from disclosure for relocation loans cover loans incurred in purchasing a personal pleasure

craft, a point even Swartz conceded at trial. The fact that defendants recorded these loans as KELP or relocation loans did not transform the loans—used for unauthorized, personal purposes—into an ordinary-course loan or a KELP loan. They were neither.

Defendants also raise several evidentiary issues. We conclude that the challenged portion of the testimony of a People's witness, Tse, was not offered or used to impeach the testimony of another People's witness, Prue, but rather to show, as the People argued, Tse's own recollection of the relevant events. Her testimony did not fall within any of the three categories of proscribed forms of impeachment testimony (*see Becker v Koch*, 104 NY 394, 401 [1887]; *see generally* Prince, Richardson on Evidence § 6-419 [Farrell 11th ed]).

The portion of Swartz's statement (as related by David Boies) that inculpated Kozlowski, however, should technically not have been admitted against Kozlowski since defendants' conspiracy to commit larceny had ended by the date of the statement (*see People v Storrs*, 207 NY 147, 158 [1912]; *People v Van Vleet*, 256 AD2d 1181, 1182-1183 [1998], *lv denied* 93 NY2d 879 [1999]), and there was no evidence that the conspiracy continued or that Kozlowski did anything after June 3, 2002 (the date on which he left Tyco) to impede the recovery of Tyco's money or property. The People may not extend the conspiracy merely by claiming that defendants were trying to cover up their previous crimes (*see e.g. Lutwak v United States*, 344 US 604, 616-617 [1953]). Nor was the statement in furtherance of the conspiracy because it placed responsibility on Kozlowski for authorizing a 1999 journal entry that collectively reduced defendants' loan balance to Tyco by $37.5 million. As noted, the record shows that the transaction had never been authorized by Tyco's board of directors. This reference to Kozlowski, however, merely confirmed that Kozlowski had authorized the transaction—as he testified—after he had spoken to Hampton, chairman of the remuneration committee. As already noted, however, the committee's approval, acting as a whole, was required to authorize such action, and no other member of the committee supported this assertion or had ever heard of it. As the jury could take into account in assessing credibility, Hampton, who had died prior to trial, could not be offered as a witness to challenge Kozlowski's testimony. We therefore find the error to be harmless (*see id.* at 619-620).

Defendants' other arguments relating to Boies's testimony are without merit. The record fails to support their assertion

that his testimony, or any summation comments by the prosecutor, gave the jury the impression that Boies had drawn a conclusion, based on his investigation and expertise, that defendants were guilty.

The court did not improvidently exercise its discretion in quashing defendants' subpoena directed to the Boies Schiller firm (*see e.g. People v Gissendanner*, 48 NY2d 543, 550 [1979]), since the documents sought were not material and exculpatory (*see e.g. People v Ricketts*, 38 AD3d 291 [2007], *lv denied* 8 NY3d 989 [2007]). In any event, were we to find any error, we would find it to be harmless.

Defendants failed to preserve their argument that they were constitutionally entitled to introduce a letter expressing an ethics opinion to the director who accepted the undisclosed payment, which was the basis of the $20 million larceny (*see People v Angelo*, 88 NY2d 217, 222 [1996]; *People v Gonzalez*, 54 NY2d 729 [1981]), and we decline to review it in the interest of justice. Were we to reach the claim, we would find it unavailing (*see Crane v Kentucky*, 476 US 683, 689-690 [1986]). Although the court excluded the letter itself, it allowed various witnesses to testify that the director told the board he had obtained legal advice suggesting that it was appropriate for him to accept the investment banking fee.

We perceive no basis for reducing either defendant's aggregate term of incarceration. Under the circumstances, the fines imposed do not violate *Apprendi v New Jersey* (530 US 466 [2000]). A court may impose a sentence above the statutory maximum based on a fact admitted by a defendant (*see Cunningham v California*, 549 US —, —, 127 S Ct 856, 860 [2007]). With respect to the counts on which the court imposed fines, defendants did not dispute the amount of their gains from the acts in question. To the extent defendants are making a constitutional argument with respect to the restitution awards, that argument is without merit (*see People v Horne*, 97 NY2d 404, 414-415 [2002]).

We have considered defendants' other arguments and find them without merit.

Accordingly, the judgments of the Supreme Court, New York County (Michael J. Obus, J.), rendered September 19, 2005, convicting defendants, after a jury trial, of grand larceny in the first degree (12 counts), conspiracy in the fourth degree, violation of General Business Law § 352-c (5) and falsifying business records in the first degree (eight counts), and sentencing them

to aggregate terms of $8^{1}/_{3}$ to 25 years, restitution of $134,351,397, and fines of $70 million for Kozlowski and $35 million for Swartz, should be affirmed.

FRIEDMAN, J.P., BUCKLEY and MALONE, JJ., concur.

Judgments, Supreme Court, New York County, rendered September 19, 2005, affirmed.