[898 NE2d 891, 869 NYS2d 848]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v L. DENNIS KOZLOWSKI, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARK H. SWARTZ, Appellant.

Argued September 2, 2008; decided October 16, 2008

**POINTS OF COUNSEL**

*Martin & Obermaier, LLC,* New York City (*John S. Martin* of counsel), *Bryan Cave LLP* (*James R. DeVita, Austin V. Campriello* and *Kathryn E. Gebert* of counsel), and *Stephen E. Kaufman, P.C.* (*Stephen E. Kaufman* and *Andrew Kaufman* of

counsel), for L. Dennis Kozlowski, appellant. I. Mr. Kozlowski was severely prejudiced by the trial court's error in allowing David Boies to testify about his extensive investigation and give his opinion on defendants' guilt. (*People v Graydon,* 43 AD2d 842; *People v Ciaccio,* 47 NY2d 431; *People v Garcia,* 76 AD2d 867; *People v Bailey,* 58 NY2d 272; *People v Huston,* 88 NY2d 400; *People v Hackett,* 228 AD2d 377; *People v Placencia,* 157 Misc 2d 397.) II. The prosecution should not have been permitted to use against Mr. Kozlowski David Boies's testimony about a statement allegedly made by Mr. Swartz that incriminated Mr. Kozlowski. III. The admission of the testimony of David Boies was highly prejudicial and was not harmless error. (*People v Hardy,* 4 NY3d 192; *People v Creasy,* 236 NY 205; *People v Crimmins,* 36 NY2d 230.) IV. The trial court erroneously quashed a defense subpoena on David Boies's law firm. V. Mr. Kozlowski's conviction of stealing a $20 million finder's fee paid to Frank Walsh and a charity should be reversed because Walsh, an investment banker, earned the fee and because Mr. Kozlowski and Walsh believed that Mr. Kozlowski had the authority to pay it. (*People v Ricchiuti,* 93 AD2d 842; *People v Chesler,* 50 NY2d 203; *People v Cahill,* 2 NY3d 14; *People v Bleakley,* 69 NY2d 490; *Cohen v Hallmark Cards,* 45 NY2d 493.) VI. The Court should reverse the convictions for stealing bonuses to which Mr. Kozlowski was legally entitled. (*Weiner v Diebold Group,* 173 AD2d 166; *Bayer v Oxford Univ. Press, Inc.,* 270 App Div 586, 296 NY 780; *People v Foster,* 73 NY2d 596; *People v Zinke,* 76 NY2d 8; *People v Ricchiuti,* 93 AD2d 842; *People v Chesler,* 50 NY2d 203.) VII. The Court should reverse the artwork convictions because Mr. Kozlowski had the authority to purchase art for Tyco and there was no evidence he did not intend to repay the money he borrowed to purchase art for himself. (*People v Jennings,* 69 NY2d 103.) VIII. Mr. Kozlowski joins in the arguments by appellant Mark Swartz. (*Apprendi v New Jersey,* 530 US 466.)

*Stillman, Friedman & Shechtman, P.C.,* New York City (*Nathaniel Z. Marmur* and *Michael J. Grudberg* of counsel), for Mark H. Swartz, appellant. I. The trial court erroneously quashed defendants' subpoena on Boies, Schiller & Flexner LLP. (*People v Gissendanner,* 48 NY2d 543; *People v Ricketts,* 38 AD3d 291, 8 NY3d 989; *People v Le Grand,* 67 AD2d 446; *Pennsylvania v Ritchie,* 480 US 39; *People v Rutter,* 202 AD2d 123; *United States v Nixon,* 418 US 683; *Chemical Bank v National Union Fire Ins. Co. of Pittsburgh, Pa.,* 70 AD2d 837; *Goldberg v Hirschberg,* 10 Misc 3d 292; *DeGourney v Mulzac,* 287 AD2d 680;

*People v Perez,* 171 Misc 2d 75.) II. The bonus larceny convictions were based on insufficient evidence. (*People v Harper,* 75 NY2d 313; *People v Zinke,* 76 NY2d 8; *People v Green,* 5 NY3d 538; *People v Hunter,* 34 NY2d 432; *People v Kirk,* 62 Misc 2d 1078; *Guggenheimer v Bernstein Litowitz Berger & Grossmann LLP,* 11 Misc 3d 926; *Mirchel v RMJ Sec. Corp.,* 205 AD2d 388; *Weiner v Diebold Group,* 173 AD2d 166; *Hall v United Parcel Serv. of Am.,* 76 NY2d 27; *R/S Assoc. v New York Job Dev. Auth.,* 98 NY2d 29.) III. Mark Swartz joins in the brief of his codefendant. (*Boyle v Petrie Stores Corp.,* 136 Misc 2d 380.) IV. The fine violated Mr. Swartz's Sixth Amendment jury trial rights. (*Apprendi v New Jersey,* 530 US 466; *Ring v Arizona,* 536 US 584; *United States v Booker,* 543 US 220; *People v Rivera,* 5 NY3d 61; *County of Nassau v Canavan,* 1 NY3d 134; *Matter of Dumbarton Oaks Rest. & Bar v New York State Liq. Auth.,* 58 NY2d 89; *United States v Rattoballi,* 452 F3d 127; *United States v LaGrou Distrib. Sys., Inc.,* 466 F3d 585; *United States v Meyer,* 427 F3d 558; *United States v Reifler,* 446 F3d 65.)

*Robert M. Morgenthau, District Attorney,* New York City (*Amyjane Rettew* and *Gina Mignola* of counsel), for respondent. I. The evidence fully supports the verdict convicting defendants of stealing the three multi-million-dollar and midyear "bonuses" they took in 1999 and 2000 without the board of directors' knowledge or approval. (*Nickerson v Volt Delta Resources,* 211 AD2d 512; *People v Hines,* 97 NY2d 56; *People v Gray,* 86 NY2d 10; *People v Finger,* 95 NY2d 894; *People v Santos,* 86 NY2d 869; *People v Foster,* 73 NY2d 596; *Jackson v Virginia,* 443 US 307; *People v Danielson,* 9 NY3d 342; *People v Contes,* 60 NY2d 620; *People v Green,* 5 NY3d 538.) II. The jury had ample reason to find defendants guilty of stealing $12 million worth of restricted stock in the summer of 2001. (*People v Danielson,* 9 NY3d 342.) III. The jury properly convicted defendants of stealing millions of dollars L. Dennis Kozlowski used to buy himself artwork. (*People v Kramer,* 92 NY2d 529; *People v Vandermuelen,* 42 AD3d 667; *People v Norman,* 85 NY2d 609; *People v Jennings,* 69 NY2d 103; *People v Yannett,* 49 NY2d 296; *People v Robinson,* 284 NY 75; *People v Meadows,* 199 NY 1; *Boyle v Petrie Stores Corp.,* 136 Misc 2d 380; *People v Ponnapula,* 266 AD2d 32.) IV. The jury properly found defendants guilty of stealing the $20 million they secretly paid to Frank Walsh. (*Cohen v Hallmark Cards,* 45 NY2d 493; *People v Chesler,* 50 NY2d 203; *People v Ricchiuti,* 93 AD2d 842.) V. The trial judge properly found that Mark Swartz's explanation of his 1999 bonus was a statement in furtherance of defendants' ongoing conspiracy to

retain possession of the money they had stolen. (*People v Ryan*, 263 NY 298; *Lutwak v United States*, 344 US 604; *People v Van Vleet*, 256 AD2d 1181; *United States v Knuckles*, 581 F2d 305; *United States v Warren*, 578 F2d 1058; *People v Storrs*, 207 NY 147; *United States v Grubb*, 527 F2d 1107; *United States v Papia*, 560 F2d 827; *United States v Thompson*, 476 F2d 1196; *People v Crimmins*, 36 NY2d 230.) VI. The judge's rulings about the Boies firm's work were sound and the jury heard no improper opinion evidence. (*People v Hackett*, 228 AD2d 377; *People v Ciaccio*, 47 NY2d 431; *People v Graydon*, 43 AD2d 842; *People v Smith*, 2 NY3d 8; *People v Cronin*, 60 NY2d 430; *People v Huston*, 88 NY2d 400; *People v Bailey*, 58 NY2d 272.) VII. Defendants cannot obtain a new trial on the basis of documents they conceded were privileged, especially without any showing that the documents contain any information that could have affected the jury's assessment of any material issue. (*People v Le Grand*, 67 AD2d 446; *People v Yavru-Sakuk*, 4 NY3d 814; *People v Rutter*, 202 AD2d 123; *Pennsylvania v Ritchie*, 480 US 39; *Davis v Alaska*, 415 US 308; *People v Washington*, 86 NY2d 189; *People v Kelly*, 88 NY2d 248; *People v Howard*, 87 NY2d 940; *People v Flynn*, 79 NY2d 879; *People v Gissendanner*, 48 NY2d 543.) VIII. The jury's verdict and defendants' admissions to the sentencing judge authorized the court to impose a fine of up to twice the amount of defendants' gain, and the fines actually imposed were far less than that authorized amount. (*Apprendi v New Jersey*, 530 US 466; *Ring v Arizona*, 536 US 584; *Cunningham v California*, 549 US 270; *United States v Booker*, 543 US 220; *Blakely v Washington*, 542 US 296; *People v Rivera*, 5 NY3d 61; *People v Horne*, 97 NY2d 404; *United States v Reifler*, 446 F3d 65; *United States v Dupes*, 513 F3d 338; *United States v Oladimeji*, 463 F3d 152.)

*Cohen & Gressler LLP*, New York City (*Mark S. Cohen* and *Marc E. Isserles* of counsel), for New York Council of Defense Lawyers, amicus curiae. I. A threat to individual liberties arises from "deputized" corporate investigations. (*United States v Stein*, 440 F Supp 2d 315.) II. Defendants may lose access to critical impeachment evidence in the possession of "deputized" corporate counsel. (*People v Rosario*, 9 NY2d 286; *People v Kelly*, 88 NY2d 248; *United States v Rodriguez*, 496 F3d 221; *In re Qwest Communications Intl. Inc.*, 450 F3d 1179; *In re Columbia/ HCA Healthcare Corp. Billing Practices Litig.*, 293 F3d 289; *Permian Corp. v United States*, 665 F2d 1214; *United States v Massachusetts Inst. of Tech.*, 129 F3d 681; *In re John Doe Corp.*, 675 F2d 482; *Westinghouse Elec. Corp. v Republic of Philip-

*pines,* 951 F2d 1414; *In re Martin Marietta Corp.,* 856 F2d 619.) III. The trial court's order quashing defendants' subpoena for potentially critical impeachment evidence undermines core Sixth Amendment protections. (*People v Gissendanner,* 48 NY2d 543; *Weatherford v Bursey,* 429 US 545; *Washington v Texas,* 388 US 14; *In re Martin Marietta Corp.,* 856 F2d 619; *Chambers v Mississippi,* 410 US 284; *People v Chipp,* 75 NY2d 327; *United States v Hubbell,* 530 US 27; *Davis v Alaska,* 415 US 308; *People v Thurston,* 209 AD2d 976; *Pennsylvania v Ritchie,* 480 US 39.) IV. The work product doctrine should not bar defendants' right to obtain core impeachment evidence. (*Washington v Texas,* 388 US 14; *Hickman v Taylor,* 329 US 495; *United States v Nixon,* 418 US 683; *Cheney v United States Dist. Court for D. C.,* 542 US 367; *In re Grand Jury Subpoena Dated July 6, 2005,* 510 F3d 180; *United States v Libby,* 432 F Supp 2d 26; *United States v Skeddle,* 989 F Supp 912; *People v Grady,* 130 Misc 2d 677; *DeGourney v Mulzac,* 287 AD2d 680.)

*Skadden, Arps, Slate, Meagher & Flom, LLP,* New York City (*Preeta D. Bansal* of counsel), *Susan Hackett, General Counsel, Association of Corporate Counsel,* Washington, DC, *Skadden, Arps, Slate, Meagher & Flom, LLP* (*Clifford M. Sloan, Amy R. Sabrin* and *Darren M. Welch,* of the District of Columbia bar, admitted pro hac vice, of counsel), and *Stephen Gillers,* New York City, for Association of Corporate Counsel, amicus curiae. I. The attorney-client privilege and work product doctrine serve important policy functions. (*Upjohn Co. v United States,* 449 US 383; *Hickman v Taylor,* 329 US 495; *United States v Nobles,* 422 US 225; *Corcoran v Peat, Marwick, Mitchell & Co.,* 151 AD2d 443; *Delta Fin. Corp. v Morrison,* 15 Misc 3d 308; *People v Torres,* 251 AD2d 519; *People v Marin,* 86 AD2d 40; *Spectrum Sys. Intl. Corp. v Chemical Bank,* 78 NY2d 371; *People v Mitchell,* 58 NY2d 368; *Rossi v Blue Cross & Blue Shield of Greater N.Y.,* 73 NY2d 588.) II. The new legal standard proposed by opposing amicus is contrary to law and unwarranted in this case. (*People v Radtke,* 153 Misc 2d 554; *People v Marin,* 86 AD2d 40; *Warren v New York City Tr. Auth.,* 34 AD2d 749; *Friedman v Connecticut Gen. Life Ins. Co.,* 9 NY3d 105; *Parisi v Leppard,* 172 Misc 2d 951; *Ancona v Net Realty Holding Trust Co.,* 153 Misc 2d 946; *Upjohn Co. v United States,* 449 US 383; *Hickman v Taylor,* 329 US 495; *People v Rosario,* 9 NY2d 286; *People v Flynn,* 79 NY2d 879.)

**OPINION OF THE COURT**

CIPARICK, J.

In this appeal relating to the convictions of two former execu-

tives for crimes associated with corporate wrongdoing, we are asked to determine whether the admission of an attorney's testimony concerning certain facts related to a corporate internal investigation improperly conveyed to the jury an opinion regarding defendants' guilt. We conclude that this testimony—and the prosecutor's summation comments thereon—did not convey such an opinion. Second, we hold that Supreme Court did not abuse its discretion in quashing defendants' subpoena duces tecum, which sought the factual portions of certain interview notes and a memorandum prepared during the course of the internal investigation. Although defendants satisfied the minimal threshold showing necessary for enforcement, the materials defendants requested are shielded from production by the qualified privilege covering trial preparation materials (see CPLR 3101 [d] [2]). Finally, we do not reach the question whether the fines imposed under Penal Law § 80.00 violated *Apprendi v New Jersey* (530 US 466 [2000]), because we conclude that if error exists it was harmless.

I.

Defendants are the former chief executive officer (L. Dennis Kozlowski) and chief financial officer (Mark H. Swartz) of Tyco International Ltd., a publicly-held diversified manufacturing company. After a nearly six-month trial, a jury convicted defendants of 12 counts of first degree grand larceny (Penal Law § 155.42), eight counts of first degree falsifying business records (Penal Law § 175.10), one count of fourth degree conspiracy (Penal Law § 105.10 [1]) and one Martin Act count of securities fraud (General Business Law § 352-c [5]).[1] The principal charges concerned defendants' theft of four multi-million-dollar "bonuses" between 1999 and 2001.

Defendants' convictions arose primarily out of their abuse of two Tyco loan programs: the Key Employee Loan Program (KELP) and the relocation loan program. KELP allowed defendants and other executives to borrow funds to pay taxes due upon the vesting of restricted stock. The relocation loan program covered certain moving expenses incurred when the company transferred an employee to a new geographic area. Defendants did not, however, utilize these programs for permissible purposes. Instead, they incurred debts under them that were used to finance opulent lifestyles.

---

1. This was a second trial. The initial trial ended in a mistrial during jury deliberations.

For example, in 2001, Swartz assisted Kozlowski in charging $12.75 million in purported KELP loans to cover the cost of nine paintings, including a Monet and a Renoir. These paintings were hung in a $30 million Fifth Avenue apartment that Kozlowski shared with his wife.[2] Kozlowski also purchased a $7.2 million Park Avenue residence, which he later relinquished as part of a divorce settlement, by charging it to his Tyco relocation account as a no-interest loan. Additionally, Kozlowski utilized KELP loans to finance millions of dollars in jewelry purchases and an $8.3 million stake in a New Jersey sports partnership. Swartz similarly had millions of dollars in company loans transferred to his personal accounts to cover the costs of personal expenditures and investments. By August 1999, Kozlowski and Swartz owed Tyco $52.7 million and $17.4 million, respectively. To satisfy these obligations, defendants turned to Tyco's "Incentive Compensation Plan."

Under the Plan, defendants were entitled to a base salary regardless of the company's performance, but had the potential to earn "performance awards," or bonuses, by exceeding certain performance goals or "hurdles." These awards took the form of cash payments and the vesting of restricted stock. In general, Swartz's potential awards were half those of Kozlowski's.

Performance goals were established by Tyco's four-member Compensation Committee, under authority delegated to it by the corporation's board of directors. The Incentive Compensation Plan specifically provided that prior to any payments the Committee would certify that the performance goals had been satisfied. Such certification generally took place at the close of Tyco's fiscal year, which ended on September 30, when audited financial results were available.[3] The Committee would review information packages prepared by employees working under the direction of defendants. In addition, Swartz would appear before the Committee to explain whether that year's performance goals had been satisfied. Following its review, the Committee—acting as a whole—would determine whether any bonuses were due defendants and record its awards in the official minutes.

These procedures were not employed with respect to the four so-called "mega-larceny" bonus counts, under which the jury

---

**2.** Kozlowski characterized this residence, which was only used by him and his wife, as a "hotel room," albeit one that was "larger and more elaborate."

**3.** A 1997 amendment to the Incentive Compensation Plan permitted the Committee to authorize payments prior to the close of the fiscal year. No documentation or third-party testimony was presented that this authority was exercised with respect to any of the alleged larcenies.

convicted Kozlowski and Swartz of stealing $77 million and $44.5 million, respectively. Two of these bonuses—those paid in August 1999 and August 2000—took the form of reductions of debts that defendants owed Tyco. During the relevant time periods, defendants' loan balances were considerable. Even after they ordered bonus payments of $25 million (Kozlowski) and $12.5 million (Swartz) in August 1999, Kozlowski still owed $27.7 million and Swartz owed $4.9 million. Those amounts did not decrease over time. Indeed, in August 2000, when defendants facilitated a second round of "loan-forgiveness" bonuses, including a "tax gross-up," that were valued at $32.97 million for Kozlowski and $16.6 million for Swartz, their respective loan obligations stood at $25 million and $8.3 million.

The remaining bonus counts concerned payments made in November 2000 and August 2001. In the first, defendants ordered cash payments for themselves, totaling $17.2 million (Kozlowski) and $8.65 million (Swartz). In connection with the November 2000 bonus, defendants also received $8.2 million (Kozlowski) and $4.1 million (Swartz) worth of stock. The August 2001 bonus took the form of a vesting of restricted stock. After the bonus transaction was processed, defendants sold that stock for $8.2 million (Kozlowski) and $4.1 million (Swartz).

Common to all four of these bonuses was the absence of documentation in the information packets provided to the Compensation Committee or that Committee's minutes authorizing the bonuses that defendants received. In addition, every member of the Compensation Committee who was available to testify at trial denied approving these purported bonuses.

Defendants asserted, however, that the bonuses had been properly authorized. As to the first three bonuses, their claim rested primarily upon Kozlowski's communications with the late Philip Hampton, the former chair of the Compensation Committee.[4] Kozlowski testified that he had explained the justification and mechanics of these bonuses to Hampton. According to Kozlowski, Hampton's response was that he was "fine with" the bonuses and that he would "handle" the authorization of the payments by "dealing with the issues" raised by the Compensation Committee and by requesting additional materials from Kozlowski and his subordinates, if necessary.

---

4. At the time that he allegedly authorized the first bonus payment in August 1999, Hampton was suffering from cancer and receiving radiation treatment and chemotherapy.

Defendants proffered no documentation from Hampton or Kozlowski reflecting these assurances. Swartz did assert that he made certain presentations to the Compensation Committee and the board, but also offered no evidence to support that claim.

Hampton died prior to defendants' receipt of the August 2001 bonus. Kozlowski claims that this bonus was approved by Stephen Foss, then-chair of the Compensation Committee. After Kozlowski told him that the bonus had been approved, Swartz ordered that it be processed. Under the heading "FY 2001 Projected Incentive Plan Projected Payments," the Compensation Committee's October 2001 minutes contain a resolution stating that the restricted stock bonus "vested on June 20, 2001." But defendants had already sold this stock to a Tyco subsidiary in August 2001, long before the Compensation Committee passed this retroactive vesting resolution. There is no documentation or third-party testimony demonstrating that the Committee was aware at the time of passage that such sales had occurred.

In April 2002, Tyco retained the law firm of Boies, Schiller & Flexner LLP (Boies Schiller) to conduct an internal investigation into Kozlowski's payment of a $20 million investment banking fee to a member of the company's board, Frank Walsh.[5] The May 17, 2002 retention letter memorializing this engagement states that it encompassed "any litigation arising from or relating to" a review and analysis of transactions between the company and "certain of its directors and officers." Such litigation, including a federal multi-district litigation in a federal court in New Hampshire, did in fact eventually commence.

At least a dozen Boies Schiller attorneys assisted in the investigation, which was headed by the firm's founding partner, David Boies. Although initially confined to the circumstances surrounding the Walsh payment, the Boies Schiller investigation expanded in June 2002, when Kozlowski resigned as CEO after being indicted for his failure to pay sales taxes owed on

---

5. Without informing Tyco's board of directors or its shareholders, defendants arranged this payment to Walsh in exchange for his efforts in facilitating Tyco's merger with the CIT Group in March 2001. Because they believed that payments of less than $15 million did not need to be disclosed in Tyco's proxy statement, defendants had $10 million paid to Walsh and another $10 million paid to a charity of his choosing. Walsh pleaded guilty to a securities fraud charge for concealing the payment and was sentenced to a fine and a conditional discharge. Defendants were convicted of first degree grand larceny for having approved and facilitated the Walsh payment.

artwork that he purchased. On June 3, 2002, the Boies Schiller attorneys began looking into whether Tyco's directors and officers had engaged in improper transactions with company funds. In connection with this assignment, they interviewed Tyco's employees and directors. These interviews occurred following Kozlowski's departure from Tyco.

On July 17, 2002, Boies interviewed Swartz regarding the August 1999 bonus. Boies met with Swartz alone and he did not take notes or otherwise memorialize the interview. That same day, Boies met with director, and then-interim CEO, John Fort to report the results of his interview with Swartz; Swartz was present for a portion of this meeting. Subsequently, Boies also met with Tyco's new CEO, and Fort's replacement, Ed Breen, regarding Swartz's continued employment and recommended that Tyco's board of directors accept a severance package that would pay Swartz $50 million.

As part of their investigation, Boies Schiller attorneys also interviewed Tyco's directors. As evidenced by Boies Schiller's retention letter, the purpose of these interviews was to assist the company in preparing for potential litigation, particularly shareholder derivative suits. Thus, on June 6, 2002, a Boies Schiller attorney interviewed director Fort. As summarized in privilege logs that Tyco filed in connection with the federal multi-district litigation in New Hampshire, this interview concerned the "Walsh payments." On August 12 and 13, 2002, Boies Schiller attorneys interviewed all the surviving members of the Compensation Committee—directors Stephen Foss, Peter Slusser and James Pasman. The federal privilege logs summarize these interviews as concerning the KELP and relocation loan programs, "Compensation Events" and "Use of Company Assets."[6]

On August 1, an agreement was reached whereby Swartz would resign from Tyco's board of directors immediately, but continue as CFO until a successor was found. The August 1 agreement also limited Swartz's severance, in the event that he was terminated as CFO prior to being convicted of a felony, to $50 million. This reduced Tyco's severance obligation, as set forth in an earlier retention agreement, by $100 million. Around the time that the August 1 agreement was entered, Tyco publicly announced that Swartz would leave the company when a new CFO was hired.

---

6. The relevant interviews were memorialized in handwritten notes and a draft memorandum.

On August 14, Tyco's board voted to approve the August 1 agreement. After that date, however, Swartz continued to serve as Tyco's CFO until he was terminated on September 11, 2002, one day before he was indicted. In that capacity, he participated in investor conference calls as one of Tyco's spokespersons and signed Tyco's 10-Q as its representative under the federal Sarbanes-Oxley Act.

The subpoena duces tecum in question, joined in by Kozlowski, was served by Swartz's counsel on October 13, 2004—approximately six months after the initial mistrial in this case—in preparation for defendants' second trial. It sought from Boies Schiller "[a]ll memoranda and notes of [the firm's] personnel (or forensic accountants working on their behalf) relating to interviews of employees, directors or auditors of Tyco." The relevant interviews covered a range of 19 topics, including executive compensation, the $20 million payment to Frank Walsh and the payment or recording in Tyco's books and records of the bonuses.

On behalf of Tyco, Boies Schiller moved to quash the subpoena, arguing that it was overbroad and impermissibly sought disclosure of materials shielded by the attorney-client and work product privileges.[7] In response, defendants' counsel submitted an affirmation, which attached as an exhibit the federal privilege logs. Defendants placed a check mark next to 72 privilege log entries, which, they said, identified the documents responsive to their subpoena.[8]

Defendants acknowledged that there was "little dispute" that the requested materials were either attorney-client or work product privileged, but claimed that Tyco waived both privileges. According to defendants, waiver had occurred through: (1) Tyco's production to the District Attorney of a large volume of privileged documents, predating the Boies Schiller investigation, (2) testimony by Tyco's in-house and corporate counsel and employees regarding privileged conversations prior to the investigation, (3) the introduction in evidence of privileged communications and work product prepared by Tyco's corporate

---

**7.** Before filing their reply brief on the motion to quash the subpoena, Tyco did provide 4 of the 72 requested documents to defendants. These were notes and memoranda describing interviews with Swartz, "redacted to exclude attorney's opinions or mental impressions," that Boies Schiller delivered to both defendants and the People.

**8.** Only three of those entries—those that described the June 6, August 12, and August 13 director-witness interviews—are relevant here.

and litigation attorneys before the investigation, (4) Boies's direct testimony at the first trial, and (5) Tyco's having "cooperat[ed] fully" with the District Attorney's investigation by responding to document requests and questions from that office and preparing employees for interviews with assistant district attorneys.

To justify their demand for the director-witness interview notes, defendants argued that such documents "go directly to the issues underlying this indictment" and "likely reflect a better recollection by those witnesses of details and facts th[a]n the witnesses had at trial, or will have upon a retrial almost three years after the interviews." In sum, defendants argued that they were entitled to these privileged documents because they are "relevant and material" and because they "more than adequately identified those specific memoranda and notes th[at] . . . [are] responsive to the subpoena."

In response, Tyco argued that defendants had not shown a substantial need for the Boies Schiller work product and an inability to duplicate the same because "Swartz and his lawyers have access to the same witnesses Tyco does. He can interview them, he has already cross-examined them, and he can investigate them as well as Boies Schiller did." In addition, Tyco contended that disclosure of attorney-client and work product privileged documents produced "in the ordinary course of Tyco's business" or for "litigations no longer at issue," which the company referred to as "historical privileged communications," could not effect a subject matter waiver over privileged materials prepared in the course of a subsequent internal investigation.

Finally, Tyco asserted that defendants' "suppos[ition]" that it had "presented to the District Attorney the substance of *everything* contained in its attorney's memoranda and notes [was] . . . incorrect" (emphasis added). The company argued that it could respond to subpoenas and document requests, answer questions and otherwise cooperate with the District Attorney's Office without "presenting . . . Boies Schiller's analysis and strategy from its investigation." To bolster this point, Tyco cited the statement of an assistant district attorney during the related criminal trial of Tyco's former general counsel, Mark Belnick: "I cannot agree with the representation that the Boies firm have been reporting the results of their interviews to the District Attorney's Office." At oral argument, Tyco's counsel stated that, with respect to "Boies Schiller's communications

with the District Attorney's Office . . . there w[as]n't disclosure of Boies Schiller work product" and that "Tyco did not disclose the results of its investigation to the District Attorney's Office."

On January 14, 2005, Supreme Court quashed the subpoena. The court ruled that no waiver of the work product privilege had occurred because "there is no showing that Tyco has disclosed work product created by Boies, Schiller to the District Attorney." In addition, the court concluded that defendants were not entitled to the director-witness materials under CPLR 3101 (d) (2) because, although they pointed to the importance in this case of the witnesses' knowledge and the passage of time since the interviews were undertaken, defendants had not explained why they could not have sought to conduct their own interviews of these witnesses at an earlier time.

At trial, defendants did not move to reopen the subpoena question following the director-witnesses' testimony. In the course of Boies's direct, however, they objected that they had not seen a privileged memorandum that described how Boies Schiller had discovered the illicit August 1999 bonus. The prosecutor responded by reiterating Tyco's claim that no materials prepared by Boies Schiller during the investigation had been shared with the People, stating: "I want to emphasize that neither the defense nor the prosecution has access to . . . materials that have been held to be privileged." Defense counsel further explained, however, that "[i]t seems like that memorandum is the sole source of information that [Boies is] relying on for his testimony, and I think it would be inappropriate for us not to have access to [it]." The court agreed and ordered production of the memorandum.

Defendants were convicted and Supreme Court imposed concurrent prison terms of 8⅓ to 25 years on each of the four bonus counts. In addition, the court ordered joint restitution of $134,351,397 and that fines of $35 million and $70 million be imposed on Swartz and Kozlowski, respectively. With one exception—where the amount was $3 million less—each of these fines corresponded to the amounts set forth in the indictment and amounts that defendants affirmatively testified to having taken. Responding to defendants' constitutional argument against imposition of the fines, Supreme Court held that "Apprendi applies to the terms of prison sentences as opposed to fines."

The Appellate Division affirmed in all respects (see 47 AD3d 111 [2007]). The court concluded that Boies's testimony and the

prosecutor's summation comments thereon did not convey Boies's personal opinion as to defendants' guilt of the crimes charged; that defendants' subpoena was properly quashed because "the documents sought were not material and exculpatory" (*id.* at 120); and that there was no *Apprendi* violation because defendants had "not dispute[d] the amount of their gains from the acts in question" (*id.*).

A Judge of this Court granted defendants leave to appeal (10 NY3d 767, 772 [2008]) and we now affirm.

## II.

Defendants first argue that they are entitled to a new trial because of the prejudicial effect of Boies's testimony and the People's summation comments on that testimony. Because the testimony and summation complained of merely set forth facts enabling the jury to draw an inference of defendants' guilt, we disagree.

As an initial matter, the trial court did not abuse its discretion in permitting the People to elicit Boies's background, a general overview of internal investigations and the scope of the Tyco investigation. Defendants assert that testimony regarding Boies's credentials—including his having lectured on the topic of internal investigations—and his statement that law firms conducting internal investigations often work both with forensic accountants specially trained to ferret out "wrongdoing" and with law enforcement authorities, impermissibly cast a "patina of officialdom" over Boies Schiller's work on behalf of Tyco. This background testimony was not unduly prejudicial. Indeed, such testimony is generally admissible, especially where, as here, it provides helpful context for the jury about complex subject matter, such as an internal investigation. In addition, such evidence was also admissible to allow the jury to evaluate defendants' contention that Boies's representation of Tyco in ancillary civil litigation gave him a motive to slant his testimony in favor of the People (*see* 2-401 Weinstein's Federal Evidence § 401.04 [4] [a]). We turn then to the substance of Boies's direct testimony at the second trial.

The purpose of Boies's testimony was twofold. First, the People sought to use Boies's account of his conversation with Swartz to undercut defendants' claim that they had taken the August 1999 bonuses in good faith (*see* Penal Law § 155.15). Second, in response to Swartz's eliciting testimony tending to show that the board continued to employ him as CFO after it

was aware of the August 1999 bonuses, Boies's testimony as to his conversations with Tyco's board and senior management were used to establish how the company reacted once it became aware of evidence suggesting that Swartz may have violated company compensation procedures.

Boies's testimony on these subjects was limited to a firsthand factual account. Thus, Boies told the jury that, on July 17, 2002, he explained to Swartz that his firm's investigation had uncovered "no documentation," either from Tyco's board or the Compensation Committee, authorizing the August 1999 multi-million-dollar bonuses. Boies then explained that Swartz's response to this factual assertion was that a "journal entry" authorizing those payments was "a mistake." As Boies further testified, never in the course of the July 17 interview did Swartz refer to the KELP loan reduction authorized by this journal entry as "a bonus." Rather, said Boies, Swartz stated that he instructed Tyco's director of financial operations, Mark Foley, to process the loan reductions because Kozlowski had told him to do it.[9] In addition, Boies testified that Swartz agreed that he would make good on his mistake by repaying the money with interest.

Similarly, Boies's testimony concerning his interactions with Tyco's senior management and its board did not stray from its factual focus. Thus, Boies explained that during the July 17 interview he told Swartz that in response to questioning from Boies Schiller attorneys, Foley stated that Swartz directed him to process the August 1999 bonuses. Boies then recounted for the jury another July 17 meeting with director Fort during which Swartz confirmed his undertaking to repay the August 1999 bonus with interest; Boies then told the jury that Swartz did eventually discharge that obligation. Further, Boies explained that he provided new CEO Breen with certain "facts" and "information" concerning Swartz, which carried an "inherent" recommendation regarding Swartz's continued employment. Indeed, said Boies, Breen decided to terminate Swartz "as soon as a replacement could be identified" and to reduce his role as CFO in the interim. Boies then discussed the mechanics of the August 1 agreement that facilitated the removal of Swartz

---

**9.** The Appellate Division held that it was error to admit this statement against Kozlowski under the theory that it was made in furtherance of a conspiracy. The court concluded, however, that the error was harmless because Kozlowski testified that he instructed Swartz to make the entry after the late Philip Hampton approved the bonus (*see* 47 AD3d at 119). We agree.

as a director and limited his CFO-related severance to $50 million. He told the jury that he had advised the board to accept the agreement at the August 14 board meeting and that the board had, in fact, voted in favor of approval.

It is fundamental that facts, such as those Boies provided regarding his firm's investigation of the 1999 bonus, his conversations with Swartz and Fort, his recommendation to Breen and his advice to the board "are the appropriate subject of evidence" (*see People v Creasy*, 236 NY 205, 222 [1923]). At bottom, defendants' complaint is that Boies was permitted to rebut their testimony and theory of the case with certain facts that may have led the jury to convict. This, however, is not prohibited. The line is crossed not when a witness relates facts that may be prejudicial, but when he or she conveys—either directly or indirectly—a personal opinion regarding the defendant's criminal guilt (*see id.* at 209, 221-222; *People v Ciaccio*, 47 NY2d 431, 439 [1979]).

Contrary to defendants' assertion, this case is markedly different from *Ciaccio*. There, a police detective was called to corroborate a victim's account of a hijacking by answering a hypothetical question that assumed the facts set forth in the victim's testimony. We held that the detective's testimony that the victim's account "was not unusual" constituted improper opinion evidence because it usurped the function of the jury to test the credibility of the victim-witness (*see Ciaccio*, 47 NY2d at 439). What was impermissible about the testimony was that its sole purpose was to bolster the testimony of another witness by explaining that his version of the events was more "believable" (*id.*). It was thus the equivalent of an opinion that the defendant was guilty, which is impermissible.

Here, in contrast, Boies testified to facts. This testimony was in no sense hypothetical. Indeed, defendants were provided with Boies Schiller's work product memorandum that led to the discovery of the 1999 bonuses. Boies's testimony, when considered as a whole, relayed to the jury his preliminary findings during the investigation and the reaction of Tyco's directors and senior management when they were confronted with those findings. For example, Boies's discovery that "[t]here was no documentation" of the bonuses does not constitute a legal conclusion of guilt—the jury still had to determine defendants' intent at the time of the taking. Similarly, testimony that Breen resolved on the basis of Boies's "inherent" recommendation to remove Swartz immediately or that the board took Boies's

advice and agreed to pay Swartz $50 million in severance to facilitate such removal are not conclusions but facts, which—at most—support an inference of criminal guilt. Kozlowski and Swartz vigorously argued that they were entitled to the bonuses and never contested receiving them. And Swartz maintained that the board stood behind him even after it learned of his alleged improprieties. The People were entitled to present evidence casting doubt on those theories. In sum, Boies recounted facts, which the jurors, in light of their experience, could use to test the merits of the charges levied against defendants (see Creasy, 236 NY at 222; Ciaccio, 47 NY2d at 439).

We likewise reject defendants' assertions that the prosecutor's summation of Boies's testimony was prejudicial. Defendants place particular emphasis on the prosecutor's statement—made in response to defendants' assertion that Tyco's directors had branded them as scapegoats to avoid their own civil and criminal liability—that the board only became aware of defendants' illicit activities "after the forensic auditors had come in and combed through all the tens of millions of pages that are the books and records of Tyco [a]nd after the Boies lawyers ha[d] done their investigation." But this, as well as the prosecutor's references to Boies's factual testimony, did not convey a "personal belief or opinion" regarding the trial evidence or defendants' guilt (see People v Bailey, 58 NY2d 272, 277 [1983]). Instead it quite properly "concentrated, in argument, on proved facts and circumstances and the inferences to be drawn therefrom" (id.).

### III.

The second issue we address is whether Supreme Court abused its discretion in quashing defendants' subpoena. Our standard for enforcing a third-party subpoena duces tecum was set forth nearly 30 years ago in People v Gissendanner (48 NY2d 543, 550 [1979]). Under it, defendants must proffer a good faith factual predicate sufficient for a court to draw an inference that specifically identified materials are reasonably likely to contain information that has the potential to be both relevant and exculpatory.

Here, the People's case centers on the charge that defendants' bonuses were not approved by the Compensation Committee or the board of directors. Defendants maintain that the bonuses were properly approved through the efforts of either the late Philip Hampton or Stephen Foss. Among other things, their

subpoena seeks specifically identified statements made by the director-witnesses regarding key issues in this case, including, most notably, compensation events. Although defendants have certainly not made a robust showing under *Gissendanner*, we disagree with the People's contention that defendants were simply fishing for "general credibility" evidence (*see Gissendanner*, 48 NY2d at 548). Indeed, the trial court implicitly recognized as much by confining its written opinion on the subpoena application to questions concerning the applicability of the work product and trial preparation privileges (*cf. United States v Nixon*, 418 US 683, 703 [1974] [after determining that subpoena is otherwise enforceable court must evaluate whether documents sought are shielded by privilege]).

The proper purpose of a subpoena duces tecum, of course, is to compel the production of specific documents that are relevant and material to facts at issue in a pending judicial proceeding. The relevant and material facts in a criminal trial are those bearing upon "the unreliability of either the criminal charge or of a witness upon whose testimony it depends" (*see Gissendanner*, 48 NY2d at 550). Here, defendants seek to challenge the director-witnesses' testimony that they did not approve the four charged bonuses, evidence that bears directly on the question whether defendants took those bonuses under a good faith claim of right (*see* Penal Law § 155.15 [1]).

In meeting the burden for production, defendants need not—and indeed could not—show that director-witness statements are "actually" relevant and exculpatory (*see Gissendanner*, 48 NY2d at 550).[10] *Gissendanner* does mandate, however, that they point to specific facts demonstrating a reasonable likelihood that such material may be disclosed and that they are not engaged in a fishing expedition. In applying this standard, we must give due regard to the accused's right to a fair trial (*Ritchie*, 480 US at 56; *Nixon*, 418 US at 711).[11]

Here, defendants were not engaged in "general discovery" regarding the director-witness statements. Instead, they identi-

---

**10.** The People do not urge us to adopt the Appellate Division's framing of the *Gissendanner* test, which would require defendants to show that "the documents sought *were* . . . material and exculpatory" (*see* 47 AD3d at 120 [emphasis added]). In any event, we reject this standard, as it is "impossible" to satisfy absent review of the relevant documents (*see Pennsylvania v Ritchie*, 480 US 39, 57 [1987]).

**11.** As the People point out, defendants did not raise a constitutional argument in support of their subpoena below, and we therefore address none.

fied the specific director-witness interview notes and memorandum that they sought by referring Supreme Court to Tyco's privilege log. Defendants pointed to undisputed facts, arguing that after the directors were made aware of at least some of defendants' questionable activities through the Boies Schiller investigation, they continued to permit Swartz to exercise substantial authority as the CFO of Tyco until September 11, 2002—the day before he was indicted—and voted to pay him $50 million in severance just one day after the last of the relevant director interviews. On the basis of these facts, defendants asserted that the "directors witnesses . . . did not believe Mr. Swartz had engaged in any wrongful conduct and only 'changed their tune' after the District Attorney obtained an indictment." The People argue that this factual showing was insufficient.

■ We conclude that defendants met their burden under *Gissendanner*: they identified specific director-witness statements and proffered facts that permitted an inference that those statements were reasonably likely to contain material that could contradict the statements of key witnesses for the People. In this case, however, there is a claim that the relevant documents are privileged and thus not subject to production. Additional analysis is therefore required.

## IV.

■ As frequently occurs today, the director-witness statements were obtained in the course of corporate internal investigation, which inevitably implicates the attorney-client and work product privileges (*see* McNeil and Brian, Internal Corporate Investigations, at 18-19 [3d ed] [hereinafter McNeil and Brian]). In that connection, private law firms conducting internal investigations may consult with law enforcement authorities to advance their corporate client's interest in avoiding potentially serious criminal sanctions (*see e.g. United States v Stein*, 541 F3d 130, 137, 142 [2d Cir 2008]). While collaboration between prosecutors and attorney investigators may provide a public benefit through the more efficient detection and punishment of corporate wrongdoing, it may come at the expense of the proper safeguarding of the rights of individual corporate employees (*see Stein*, 541 F3d at 156-157). Courts must be sensitive to these competing considerations and endeavor to strike an appropriate balance between the rights and interests of law enforcement, corporations and their employees, and the accused. We cannot say that the balance struck by the

trial court here amounts to an abuse of discretion as a matter of law.

This case highlights a tension in CPLR 3101's treatment of attorney work product (which is not obtainable) and trial preparation materials (which may be disclosed "only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means" [CPLR 3101 (c), (d) (2)]). The separation of work product and trial preparation materials was apparently an attempt to shield materials protected by the attorney-client privilege from disclosure (see 11th Ann Rep of NY Jud Conf, at 152 [1966] ["Whoever drafted the 'work product' provision . . . was doubtless thinking of such things as private consultations between attorney and client and memoranda of them"]; Connors, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3101:27, at 53-54; Siegel, NY Prac § 347 [4th ed]). Thus, when particular work product is generated for litigation, courts have tended to classify it as trial preparation material, unless it contains otherwise privileged communications (see Connors, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3101:27, at 53-54).

Here, the director-witness interview notes and memorandum were prepared to assist Tyco's preparation for civil litigations that eventually commenced. In its motion to quash the subpoena, Tyco asserted that these materials were shielded by the attorney-client privilege, stating at oral argument that "[t]hose are interviews with Tyco employees . . . [who] are communicating with counsel for a . . . legal purpose." Assuming that these communications were confidential, this assertion may well be correct.[12] In this Court, however, neither the People nor defendants urge us to hold that the director-witness interview materials are attorney-client privileged. Instead, defendants assert that those statements are merely conditionally-privileged trial preparation materials, while the People contend that they are absolutely privileged work product.

---

**12.** A trial court may conduct an in camera review of subpoenaed materials to assess an opposing party's privilege claims (see Matter of Subpoena Duces Tecum to Jane Doe, 99 NY2d 434, 442 [2003]; accord Matter of Nassau County Grand Jury Subpoena Duces Tecum Dated June 24, 2003, 4 NY3d 665, 679 n 11 [2005]). Here, however, no such review was necessary because defendants failed to meet the statutory criteria necessary to obtain production of the director-witness statements (see CPLR 3101 [d] [2]).

On this record, we conclude that defendants have the better argument. This is because they have limited their request to "the facts reported to Boies Schiller in th[e] interviews." Indeed, defendants expressly agreed to permit Supreme Court to redact any material that would reveal opinion work product, or that portion of the interview notes reflecting the Boies Schiller attorneys' "mental impressions, opinions, or legal theories" (*see* McNeil and Brian at 47). As we explained (*see People v Consolazio*, 40 NY2d 446, 453 [1976]), the mere fact that a narrative witness statement is transcribed by an attorney is not sufficient to render the statement "work product" (*see also* Siegel, NY Prac § 347 ["The fact that a lawyer has taken a statement from a witness . . . does not transmute the statement into a 'work product': a lay person could have taken it"]; Weinstein-Korn-Miller, NY Civ Prac ¶ 3101.47 ["Where . . . statements of witnesses could not reveal legal analysis or strategy by their disclosure, and legal training might have been used but was not required for their creation, the courts should consider them trial preparations covered by CPLR 3101 (d)"]).

Although we agree with defendants that the director-witness statements are trial preparation materials and not absolutely privileged, enforcement of their subpoena was directed to the trial court's discretion (*see Gissendanner*, 48 NY2d at 550; *cf. People v Hodge*, 53 NY2d 313, 319 [1981]). In making its discretionary determination that defendants did not establish an inability to "obtain the substantial equivalent" of the facts contained in the director-witness interview notes without "undue hardship" (*see* CPLR 3101 [d] [2]; Weinstein-Korn-Miller, NY Civ Prac ¶ 3101.55), Supreme Court relied upon defendants' failure to "explain[ ] why the defense could not have sought to conduct its own interviews of these witnesses at an earlier time." We cannot say that this conclusion represents an abuse of the trial court's discretion. Defendants made no effort to show any "undue hardship" that would have prevented them from securing their own "substantial[ly] equivalent" interviews with the director-witnesses (*see* CPLR 3101 [d] [2]). As Tyco pointed out in its reply submission on its motion to quash, defendants "have access to the same witnesses as Tyco does."

Even on appeal, defendants have not proffered an explanation for their failure to seek interviews with the directors at an earlier time or stated whether they ever made an independent attempt to secure the relevant statements, a requirement for

obtaining an attorney's trial preparation materials (*see Hickman v Taylor*, 329 US 495, 513 [1947] [production of attorney's account of witness statements is justified only in "rare" cases and is not appropriate when potential for "direct interviews with the witnesses themselves" is possible]; *see also In re Grand Jury Proceedings*, 219 F3d 175, 192 [2d Cir 2000] [remanding for a determination whether government had "exhausted other means" for obtaining work product and instructing prosecutor to "explain to the district court why it cannot obtain the information it seeks through other witnesses"]; *United States v Reyes*, 239 FRD 591, 602 n 2 [ND Cal 2006]; *People v Grady*, 130 Misc 2d 677, 679 [Sup Ct, Bronx County 1985]).

Since they failed to make the requisite showing of "undue hardship" under CPLR 3101 (d) (2), defendants would only have been entitled to production of the director-witness statements if Tyco had waived the qualified privilege covering those documents (*see United States v Nobles*, 422 US 225, 239 [1975]). The qualified privilege governing trial preparation materials "is waived upon disclosure to a third party where there is a likelihood that the material will be revealed to an adversary, under conditions that are inconsistent with a desire to maintain confidentiality" (*see Bluebird Partners v First Fid. Bank, N.J.*, 248 AD2d 219, 225 [1st Dept 1998]). In response to defendants' specific waiver allegations, Tyco bore the burden of establishing that no such waiver had occurred (*see Spectrum Sys. Intl. Corp. v Chemical Bank*, 78 NY2d 371, 377 [1991]).

The determination of whether and to what extent waiver has occurred is inherently factual and turns on case-by-case considerations of "fairness" (*see John Doe Co. v United States*, 350 F3d 299, 302 [2d Cir 2003], quoting *In re Grand Jury Proceedings*, 219 F3d at 183). Although review of this discretionary determination is "highly deferential" (*John Doe Co.*, 350 F3d at 306), the U.S. Supreme Court has indicated that a trial court properly exercises its discretion when it orders disclosure of "the portion" of trial preparation materials that is directly relevant to another, previously-disclosed, portion (*see Nobles*, 422 US at 240). Thus, a party is essentially precluded from using its trial preparation materials as both a sword and a shield. In evaluating defendants' waiver claims, we must confine our analysis to those arguments they asserted before Supreme Court (*see People v Nieves*, 2 NY3d 310, 315 [2004]). We affirm Supreme Court's discretionary determination that Tyco met its burden of establishing the absence of waiver in this case.

Defendants first argue that waiver occurred when Tyco produced attorney-client and work product privileged materials to the People in response to their grand jury subpoena. Tyco had initially declined to tender these documents because it was conducting a privilege review. Two days before the grand jury's term was to expire, however, Tyco honored the District Attorney's demand that it produce the documents to prevent unnecessary delay in the grand jury's deliberations.[13] Defendants do not dispute that the documents produced in response to the subpoena do not refer to the Boies Schiller investigation. As Supreme Court found, those documents—which were prepared by Tyco's in-house and outside counsel—"were not created for the current criminal case and civil proceedings, but for past litigation, government filings and other corporate actions." In addition, it can hardly be said that Tyco was wielding the qualified privilege covering these documents as both a sword and a shield since it provided them to both the People and defendants before trial.

Defendants cite no authority for the proposition that disclosure of historical privileged documents waives the privilege covering trial preparation materials created in a subsequent internal investigation. We decline to so hold. We reach this conclusion because a trial court has discretion to limit waiver of the qualified privilege covering trial preparation to matters actually referenced in disclosed materials. Here, the materials produced to the grand jury did not—and could not—refer to director-witness interview notes and a memorandum produced in a subsequent internal investigation.[14]

Next, defendants argue that waiver occurred through Tyco's cooperation with the District Attorney's investigation. It is be-

---

**13.** In its letter accompanying production of these documents, Tyco referenced an agreement with the District Attorney, whereby "production . . . would not constitute a waiver of any privilege." In light of our conclusion that these documents were unrelated to the director-witness statements, we need not pass upon the effect—if any—of Tyco's "reservation" of its privilege.

**14.** Defendants also premise their documentary waiver claims on the introduction in evidence of KELP summaries prepared by UKW, a forensic accounting firm that assisted Boies Schiller in its investigation, and the minutes of the board's August 14 meeting, which described Boies's recommendation that Tyco fire Swartz and summarized Tyco's counsel's discussion with an assistant district attorney regarding Swartz's potential indictment. Having failed to present these claims to Supreme Court, defendants may not raise them here. But, we note that like their other examples of purported waiver, neither of these documents references or relies upon the key director-witness interview statements.

yond dispute that, had Boies Schiller provided the prosecution with the "written or recorded statements" of the director-witnesses, or had the People taken such notes themselves, defendants would be entitled to those statements pursuant to the rule of *People v Rosario* (9 NY2d 286 [1961]; CPL 240.45). But defendants ask us to hold that the statements should have been provided here based upon their conjecture that Boies Schiller attorneys shared the substance of the director-witness statements with the People. Two assistant district attorneys and Tyco's counsel, all of whom owed duties of candor to the tribunal, denied that this occurred (*see* Code of Professional Responsibility DR 7-102 [a] [5] [22 NYCRR 1200.33 (a) (5)]). Certainly, it is possible for attorneys to assist prosecutors without divulging their trial preparation materials. Absent some other proof, we conclude that Supreme Court properly held that defendants had not established any disclosure of Boies Schiller work product to the People.

Defendants also urge that "testimonial" waivers occurred at the first trial when Tyco's lawyers and employees testified regarding privileged communications that occurred prior to the internal investigation. Here, again, however, there is no showing that the jury in the first trial needed the director-witness interview notes and memorandum to properly assess the evidence.

But defendants say that "Tyco's [testimonial] waivers were not limited to events that occurred prior to the investigation." They assert that a Tyco employee's testimony that Boies asked her about the 1999 bonus and instructed her to "really think about it because he was talking about fraud" and that another Boies Schiller attorney asked her for a relocation loan plan document constituted waiver. This testimony certainly references communications with the Boies Schiller attorneys, but it does not impermissibly use the relevant director-witness statements as both a sword and shield (*see In re Grand Jury Proceedings*, 219 F3d at 192). Indeed, the referenced testimony does not even mention those statements.

According to defendants, the "most damaging" testimonial waiver occurred during the testimony of David Boies. But they point to no impermissible use of the director-witness statements. Boies's direct testimony was limited to facts concerning the interview with Foley, his July 17, 2002 conversations with Swartz and Fort, his recommendation to Breen regarding Swartz's continued employment and his recommendation that

the board approve Swartz's severance package. At no point in his testimony did Boies seek to bolster his statements with the aid of the relevant director-witness statements. Moreover, in response to defendants' specific request, Supreme Court ordered disclosure of a privileged memorandum upon which a portion of Boies's testimony was based. At that time, defendants did not request any disclosure of the director-witness statements.[15] Thus, under these circumstances, there was no waiver and no abuse of discretion (compare Nobles, 422 US at 239-240 [work product privilege over portions of investigator's report waived where "respondent sought to adduce the testimony of the investigator" regarding witness statements contained in the report]).

## V.

Finally, defendants challenge the constitutionality of the fines that were imposed upon them. They contend that these fines contravened their right to a jury trial, as guaranteed by the Sixth Amendment to the US Constitution.

Penal Law § 80.00 (1) provides that

> "[a] sentence to pay a fine for a felony shall be a sentence to pay an amount, fixed by the court, not exceeding the higher of

> "a. five thousand dollars; or

> "b. double the amount of the defendant's gain from the commission of the crime."

When a fine is imposed on the basis of "gain," "*the court* shall make a finding" as to that amount (*see* Penal Law § 80.00 [3] [emphasis added]). This finding may be based upon facts brought out at trial, a plea allocution, sentencing, or a fact-finding hearing conducted pursuant to CPL 400.30 (*see* Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 80 ["Fines"], at 6). Here, Supreme Court did not hold a CPL 400.30 hearing and instead appears to have based defendants' fines upon facts brought out at trial or conceded in "sentencing letters" that defendants filed with the court.

---

**15.** During Boies's testimony, defendants also specifically requested handwritten notes taken by director Slusser at board meetings conducted on July 2 and 17, and August 14, 2002. In response to a claim of privilege, Supreme Court reviewed these materials in camera and declined to order their production.

In *Apprendi v New Jersey* (530 US 466 [2000]) and its progeny, the U.S. Supreme Court has set forth three rules delineating when judicial fact-finding in sentencing is impermissible under the Sixth Amendment. First, the Court has directed that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" (*id.* at 490). The Court has subsequently referred to this as a "bright-line rule" (*see Blakely v Washington*, 542 US 296, 308 [2004]). Second, the " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant"* (*Blakely*, 542 US at 303; *accord United States v Booker*, 543 US 220, 235 [2005] [*Apprendi* violation occurs when judges "f(i)nd facts beyond those found by the jury"]). Third, *Apprendi* violations are subject to harmless-error review (*see Washington v Recuenco*, 548 US 212, 220-221 [2006]). We apply the third of these rules to the present case.

Assuming without deciding that an *Apprendi* violation occurred here, we nonetheless affirm because error, if any, was harmless. Our precedents establish that "all the elements of an indicted crime *which are not conceded by defendant* or defendant's counsel must be charged [to the jury]" (*see People v Flynn*, 79 NY2d 879, 881 [1992] [emphasis added]; *see also People v Walker*, 198 NY 329, 335 [1910] ["(W)hen a fact, even of great importance, is admitted by the defendant or his counsel in open court during the trial, that fact is established by the admission, and no evidence need be given in relation to it"]). Here, defendants' trial testimony—with respect to each of those counts upon which the trial court imposed fines—established gains that corresponded to or exceeded the fine amounts. Thus, the *Apprendi* violation here, if any, was harmless (*see Recuenco*, 548 US at 215).

We have considered defendants' remaining arguments and conclude that they are either unpreserved or without merit. Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge KAYE and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

In each case: Order affirmed.